ALASKA PACIFIC ASSURANCE
COMPANY and State of
Alaska, Appellants,

v.

Robert BROWN, Individually and as
Class Representative, Appellee.

Nos. 6600, 6626.

Supreme Court of Alaska.

Feb. 17, 1984.

Rehearing Granted in Part and
Denied in Part July 20, 1984.

As Modified July 20, 1984.

Robert Draper, O'Melveny & Myers, Los Angeles, Cal., and Randall J. Weddle, Faulkner, Banfield, Doogan & Holmes, Anchorage, for appellant Alaska Pacific Assur. Co.

Linda Scoccia, Asst. Atty. Gen., Wilson L. Condon, Atty. Gen., Juneau, for appellant State of Alaska.

Patrick B. Gilmore and Jerome H. Juday, Atkinson, Conway, Bell & Gagnon, Anchorage, and Herbert Colden, Los Angeles, Cal., for appellee.

Before BURKE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and DIMOND, Senior Justice.*

## OPINION

RABINOWITZ, Justice.

This appeal involves the constitutionality of former AS 23.30.175(d), which adjusted the benefits of Alaska workers' compensation recipients who had moved out of state. AS 23.30.175(d) provided:

For a recipient who resides in a state other than Alaska, the weekly rate of compensation shall be the weekly grant he would have received if he resided in Alaska times the ratio of the average weekly wage of the state in which he resides and the average weekly wage of Alaska. For the purposes of this chap-

---

* Dimond, Senior Justice, sitting by assignment made pursuant to article IV, section 11 of the Constitution of Alaska.

ter, absence from Alaska for a continuous period of more than 90 days creates a rebuttable presumption of nonresiden-

tial status; however, this presumption does not arise if the absence from Alaska is for medical or rehabilitation services.[1]

---

1. This provision was amended in 1982 along with the whole of AS 23.30.175. 1982 Alaska Sess.Laws, chap. 93, §§ 16–18, 27. Former section 175(d), the substance of which survives for purposes of this appeal, was reclassified as section 175(c). For convenience we will speak only of section 175(d) in this opinion, with the understanding that both the old and new versions are included in this reference. Former AS 23.30.175 read in its entirety as follows:

> Rates of compensation. (a) The weekly rate of compensation for disability or death for a recipient residing in Alaska may not exceed the percentage of the Alaska average weekly wage in effect on the date of injury as determined by the table contained in this subsection and initially may not be less than $65 a week. However, if the board determines that the employee's average weekly wages are less than $65 a week as computed under AS 23.30.-220, it shall issue an order decreasing the compensation to a rate equal to the employee's average weekly wages, and payments made earlier in excess of the decreased rate shall be deducted from the unpaid compensation in the manner the board determines. In any case, the employer shall pay timely compensation.

| On | The Rate Shall Be |
| --- | --- |
| July 2, 1975 | 80 per cent of the Alaska average weekly wage |
| January 1, 1976 | 100 per cent of the Alaska average weekly wage |
| January 1, 1977 | 133.3 per cent of the Alaska average weekly wage |
| January 1, 1979 | 166.6 per cent of the Alaska average weekly wage |
| January 1, 1981 | 200 per cent of the Alaska average weekly wage |

> (b) As soon as practicable after June 30 of each year, and before December 15 of each year, the commissioner shall determine the Alaska average weekly wage for the three consecutive calendar quarters ending June 30. This determination is the applicable Alaska average weekly wage for the annual period beginning with January 1 of the next year and ending December 31. The initial determination under this subsection shall be made as soon as practicable after May 22, 1975. The average weekly wage calculation for Alaska shall be based on the wages of all employees in the state, both public and private, who are covered by this chapter.

> (c) For the purposes of determining the average weekly wage of a state other than Alaska, the commissioner shall adopt the average weekly wage as computed and published by the state agency responsible for administering the workers' compensation laws of that state. For those states in which no such figure is

published, the commissioner shall adopt the average weekly wage for that state as published by the United States Secretary of Labor for the purposes of the Longshoremen's and Harbor Workers' Compensation Act (P.L. 69–803; 44 Stat. 1424; 33 U.S.C. 901 et seq.). The average weekly wage as calculated for all states shall be made available to the public.

> (d) For a recipient who resides in a state other than Alaska, the weekly rate of compensation shall be the weekly grant he would have received if he resided in Alaska times the ratio of the average weekly wage of the state in which he resides and the average weekly wage of Alaska. For the purposes of this chapter, absence from Alaska for a continuous period of more than 90 days creates a rebuttable presumption of nonresidential status; however, this presumption does not arise if the absence from Alaska is for medical or rehabilitation services.

> (e) For a recipient who resides in a jurisdiction other than a state as defined in (f) of this section, the weekly rate of compensation shall be the weekly grant he would have received if he resided in Alaska times the ratio of the average weekly wage of the jurisdiction in which he resides, as determined by the commissioner, and the average weekly wage of Alaska.

> (f) In this section "state" means a state of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Trust Territory of the Pacific Islands.

In 1982 and 1983 the statute was amended in several respects. The current version of AS 23.30.175 provides:

> Rates of compensation. (a) The weekly rate of compensation for disability or death for a recipient residing in Alaska may not exceed the percentage of the Alaska average weekly wage in effect on the date of injury as determined by the table contained in this subsection and initially may not be less than $110 a week. However, if the board determines that the employee's spendable weekly wages are less than $110 a week as computed under AS 23.30.220, it shall issue an order decreasing the weekly rate of compensation to a rate equal to the employee's spendable weekly wages, and payments made earlier in excess of the decreased rate shall be deducted from the unpaid compensation in the manner the board determines. In any case, the employer shall pay timely compensation.

| On | The Rate Shall Be |
| --- | --- |
| July 2, 1975 | 80 per cent of the Alaska average weekly wage |
| January 1, 1976 | 100 per cent of the Alaska average weekly wage |

On January 22, 1977, Robert Brown injured his left ankle and leg while employed as an electrical foreman during construction of the Trans-Alaska Pipeline. He received temporary disability benefits under the Alaska Workers' Compensation Act. After the injury, Brown returned to his home in California, and his benefits were adjusted under AS 23.30.175(d). If Brown had remained in Alaska, he would have received $551.86 per week. Under the adjustment provision, however, his benefits were reduced to $211.91 per week.

In June 1979, Brown filed a class action complaint against the Alaska Pacific Assurance Company (ALPAC), the insurance carrier for Brown's employer. Brown alleged that section 175(d) violated federal and state equal protection and due process

| On | The Rate Shall Be |
|---|---|
| January 1, 1977 | 133.3 per cent of the Alaska average weekly wage |
| January 1, 1979 | 166.6 per cent of the Alaska average weekly wage |
| January 1, 1981 | 200 per cent of the Alaska average weekly wage |

(b) After June 30 and before December 1 of each year, the commissioner shall adopt and publish the average weekly wage for each jurisdiction for the preceding calendar year as published by the United States Secretary of Labor for the purposes of unemployment insurance. In determining the rate of compensation the commissioner shall use the average weekly wage figure for each jurisdiction, including Alaska, for which the Secretary of Labor computes an average weekly wage. These figures are the applicable average weekly wages for those jurisdictions for the following calendar year.

(c) The following rules apply to recipients who do not reside in Alaska:

(1) The weekly rate of compensation shall be calculated by multiplying the recipient's weekly compensation rate calculated in accordance with AS 23.30.180, 23.30.185, 23.30.190, 23.30.200, or 23.30.215 times the ratio of the average weekly wage of the jurisdiction in which the recipient resides to the average weekly wage of Alaska. The ratio is based on the average weekly wages in effect when the recipient leaves Alaska and shall be adjusted annually upon publication of the average weekly wages for all jurisdictions.

(2) The calculation required by this subsection does not apply if the recipient is absent from Alaska for medical or rehabilitation services not reasonably available in Alaska.

(3) If the spendable weekly wage of the recipient and the resulting compensation rate is determined under AS 23.30.220(a)(1), the

guarantees, and the privileges and immunities and commerce clauses of the federal Constitution, and requested monetary damages as well as declaratory and injunctive relief.[2] Brown thereafter filed a motion for partial summary judgment, requesting that section 175(d) be declared unconstitutional and that the plaintiffs be awarded damages and injunctive relief. ALPAC and the State both filed cross-motions for partial summary judgment, requesting that section 175(d) be declared constitutional. ALPAC also requested that if the superior court invalidated the statute it not give retroactive effect to its ruling and thus deny any claims for damages.

The superior court declared AS 23.30.175(c)–(f) unconstitutional under Alaska's equal protection clause.[3] The court reject-

calculation required by this subsection applies to only those wages earned in Alaska.

(4) Application of this subsection may not result in a reduction of the weekly compensation rate to less than $110 a week except as provided in (a) of this section.

(d) In a jurisdiction for which no average weekly wage is computed by the United States Secretary of Labor for the purposes of unemployment insurance, the average weekly wage shall be as determined by the commissioner. Both current and former AS 23.30.175 must be considered since Brown seeks retroactive and prospective relief. For the purposes of our analysis we do not view the new section 175 as substantially different from its predecessor. It is true that the statute's operation has changed in several respects. Differences in the old and new version will be examined as they become relevant to our discussion.

2. The state intervened in September 1979. Under Alaska R.Civ.P. 24(c), the state may intervene in any action "[w]hen the constitutionality of a state statute affecting the public interest is drawn in question."

3. The superior court applied the three-part state equal protection formula set forth in *State v. Erickson*, 574 P.2d 1, 12 (Alaska 1978). The court found that the statute served the legitimate state purposes of reducing workers' compensation insurance premiums for Alaska employers and eliminating disincentives for non-resident recipients to return to work. The court also found that the statute substantially furthered its intended purposes. The court reasoned that "[u]nquestionably the reduction of the amounts paid to the many non-resident recipients of disability benefits will reduce the

ed ALPAC's contention that its decision should only be applied prospectively under the test set forth in *Plumley v. Hale*, 594 P.2d 497 (Alaska 1979). Class members were awarded damages in the amount of benefits they would have received if AS 23.30.175 had never been enacted.[4] We affirm that portion of the superior court's decision striking down the adjustment provision but reverse with respect to ALPAC's liability for damages.

## I. STATE EQUAL PROTECTION

Alaska's own equal protection analysis was engendered in *Isakson v. Rickey*, 550 P.2d 359 (Alaska 1976), and *State v. Erickson*, 574 P.2d 1 (Alaska 1978).[5] *Erickson* articulated an adjustable "uniform-balancing" test which placed a greater or lesser burden on the state to justify a classification depending on the importance of the individual right involved. *Id.* at 12. In effect, *Erickson* created a continuum of available levels of scrutiny, beginning with the rational basis test described in *Isakson*, 550 P.2d at 362–63, and ending with the functional equivalent of the federal compelling state interest test at the highest level of review.

■ In *Erickson* we looked first to the legitimacy of the state purposes behind challenged legislation, second to the relationship between the chosen means and the asserted goals of the statute, and third to the state's interest in the means chosen as balanced against the nature of the constitu-

tional right infringed. 574 P.2d at 12. Our recent opinion in *State v. Ostrosky*, 667 P.2d 1184 (Alaska 1983), formally revised the order of the analytic stages of *Erickson*. First, it must be determined at the outset what weight should be afforded the constitutional interest impaired by the challenged enactment. The nature of this interest is the most important variable in fixing the appropriate level of review. Thus, the initial inquiry under article I, section 1 of Alaska's constitution goes to the level of scrutiny. *Ostrosky*, 667 P.2d at 1192–93 & n. 14. Depending upon the primacy of the interest involved, the state will have a greater or lesser burden in justifying its legislation.

■ Second, an examination must be undertaken of the purposes served by a challenged statute. Depending on the level of review determined, the state may be required to show only that its objectives were legitimate, at the low end of the continuum, or, at the high end of the scale, that the legislation was motivated by a compelling state interest.

■ Third, an evaluation of the state's interest in the particular means employed to further its goals must be undertaken. Once again, the state's burden will differ in accordance with the determination of the level of scrutiny under the first stage of analysis. At the low end of the sliding scale, we have held that a substantial relationship between means and ends is consti-

total amount of insurance premiums to be paid and tend to persuade the recipients to return to work." Finally, the court weighed the state's interest in the means employed against "the extent to which the affected persons' constitutional rights may be impaired." At this stage of the *Erickson* test the court found AS 23.30.175 to be defective. First, the court concluded that the adjustment provision "caused a severe reduction in the purchasing power, in real terms, of the monetary benefits paid to disabled nonresidents." As a result of this reduction, the court concluded that "disabled workers are strongly deterred from exercising their constitutional right to travel and take up residence in another state." Further, the court suggested that "the Legislature, by simply utilizing relative cost of living statistics, could have achieved its twin goals without the substantial infringement

of the right to travel which is entailed in the use of average weekly wage statistics."

4. The superior court awarded interest, and specified that no persons who had withdrawn from the class were to receive past benefits.

5. On appeal Brown invokes a host of constitutional theories in support of the result reached by the superior court. Because we conclude that the superior court was correct in ruling AS 23.30.175 unconstitutional under the state equal protection clause, we do not pass formal judgment on the other arguments raised. *Compare Carlson v. State*, 598 P.2d 969, 973 (Alaska 1979); *Davis v. Hallett*, 587 P.2d 1170, 1171 (Alaska 1978).

tutionally adequate. At the higher end of the scale, the fit between means and ends must be much closer. If the purpose can be accomplished by a less restrictive alternative, the classification will be invalidated.

■ Thus, under *Ostrosky* our first inquiry goes to the level of scrutiny. This is "to be determined by the importance of the individual rights asserted and by the degree of suspicion with which we view the resulting classification scheme." 667 P.2d at 1192–93. Two areas of concern relevant to our inquiry are identifiable at this stage. First, Brown asserts a right to receive the full measure of workers' compensation benefits which he would receive but for the classification created by AS 23.30.175(d). Second, Brown asserts that his constitutional right to travel is directly burdened by the operation of the adjustment provision.

■ No authority has been cited by Brown for the proposition that, as a matter of constitutional law, workers' compensation benefits must be set at any particular level. Although the rule of thumb often stated is that benefits should approximate two-thirds of the worker's salary at the time of injury,[6] this is hardly a constitutional mandate. It is no longer the rule in Alaska, which now attempts to pay an injured worker four-fifths of his or her "spendable weekly wage," and even this rule of thumb figure is subject to a fixed ceiling, so that some highly-paid workers receive only a small fraction of their former earnings in compensation benefits.[7] Further, Alaska benefits may be modified under AS 23.30.130 if a sufficient "change in conditions" is demonstrated to warrant either an increase or decrease in the original award.[8] AS 23.30.175(d) might be viewed as a blanket "change in condition" adjustment for workers who have moved out of state.[9] Even though the "change"

---

**6.** *See Wien Air Alaska v. Arant*, 592 P.2d 352, 360 (Alaska 1979), and the versions of AS 23.30.185, AS 23.30.190(a), and AS 23.30.200 in effect when Brown was injured. The House Committee Report accompanying amendments to the federal Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., states that, "The basic requirement of the Act is for the injured worker to receive 66⅔% of his average weekly wage." House Comm. on Education and Labor, Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, H.R. Rep. No. 92–1441, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad.News 4698, 4700.

**7.** AS 23.30.175(a), *supra* note 1, creates an absolute ceiling for benefits of all classes based upon the current average wages in Alaska. For the concept of "spendable weekly wage" and the associated 80% rule, see AS 23.30.220 and the state statutes cited at note 6 *supra*.

Although actual pre-injury earnings are generally the measure of compensation, they are not always used. Where actual earnings are thought not to fairly represent wage-earning capacity the Board can make adjustments, as it can in special cases of apprentices and volunteer firemen. *See* AS 23.30.210, AS 23.30.220(a)(2), (3) and (4). Similar rules were in effect when Brown was injured.

**8.** AS 23.30.130(a) provides:
(a) Upon its own initiative, or upon the application of any party in interest on the ground of a change in conditions, including, for the purposes of AS 23.30.175, a change in residence, or because of a mistake in its determi-

nation of a fact, the board may, before one year after the date of the last payment of compensation, whether or not a compensation order has been issued, or before one year after the rejection of a claim, review a compensation case in accordance with the procedure prescribed in respect of claims in AS 23.30.100. In accordance with AS 23.30.110 the board may issue a new compensation order which terminates, continues, reinstates, increases, or decreases the compensation, or award compensation.

**9.** The bulk of "reopening" cases involve a claim by the worker that his or her disability has worsened and that his or her benefits should go up. A substantial portion of reopenings, however, are brought by employers or carriers who assert that the initial award overestimated the extent of the worker's disability, and that it is appropriate to reduce his or her benefits. Normally the debate centers upon the physical condition of the recipient. 3 A. Larson, The Law of Workmen's Compensation, § 81.31(a) at 15–553–554.18 (1983). As to whether economic changes may not also be considered, the small number of cases on point have split on the question. 3 Larson, § 81.31(e) at 15–554.41–554.42. *See Lerner v. Jakwall Embroidery Co.*, 203 A.D. 381, 196 N.Y.S. 736, 738 (1922) (rule allowing for compensation to be changed "as wages vary from time to time" would produce constant reopenings and administrative confusion); *McCormick S.S. Co. v. U.S. Employees' Compensation Comm'n*, 64 F.2d 84, 86 (9th Cir. 1933) (reopenings under the federal statute not

to which section 175(d) reacts is one in economic condition, we cannot say that a worker has an inherent right to benefits set in disregard of his or her economic environment.

■ Brown's argument, however, is something different than this. The basis of his claim is not that section 175(d) adjusts benefits according to criteria which are impermissible per se. Rather, he asserts that non-resident workers who fall under section 175(d) are subject to criteria different than applied to non-section 175(d) recipients. Brown thus states the following interest for the purposes of equal protection analysis: the right of section 175(d) recipients to have their workers' compensation benefits determined in relation to the same factors that are applied to workers' compensation recipients in general. This, however, is merely a particularized expression of the right to equal treatment of those similarly situated, the general principle underlying our equal protection clause. It is not itself an individual right appropriate for standard criteria selection.

■ AS 23.30.175(d) distinguishes recipients who remain in Alaska from those who move out of state. Thus, Brown asserts that section 175(d) imposes a direct penalty upon those recipients who choose to leave Alaska, and thereby burdens their right to travel. The right of interstate migration is a part of the Alaska Constitution. *Williams v. Zobel (Zobel II)*, 619 P.2d 448, 452 (Alaska 1980), *rev'd on other grounds*, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982). The suspicion with which this court will view infringements upon the right to travel depends upon the degree to which the challenged law can be said to penalize exercise of the right. *See id.* at 457–58; *Williams v. Zobel (Zobel I)*, 619 P.2d 422, 432–33 (Alaska 1980) (Rabinowitz, C.J., concurring).[10] This in turn depends upon the objective degree to which the challenged legislation tends to deter interstate migration.[11]

One central area of dispute in this case is whether section 175(d) has any adverse impact upon recipients affected. The state and ALPAC argue that there is no negative effect, and that section 175(d) is necessary to prevent workers who move out of state

warranted because of changed economic conditions).

**10.** Both the analysis and the terms of art within the context of Alaska's right to travel guarantee are different than in the federal law. Migration cases in the federal courts adopt the rigid two-tiered analysis characteristic of federal equal protection. In order for strict scrutiny to apply, it must be shown that the classification burdens "basic necessities of life" or some "fundamental political right." *Zobel I*, 619 P.2d at 426; *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 259, 94 S.Ct. 1076, 1082, 39 L.Ed.2d 306, 315 (1974). If a lesser individual interest is implicated by the state's classification, the test of minimum rationality is employed. *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). In the federal courts, the right to travel is "penalized" only if a right sufficient to invoke the strict scrutiny test is impaired. *See Zobel II*, 619 P.2d at 454–55. Prior to *Zobel I* and *Zobel II* we viewed the right to travel as a fundamental right per se, and uniformly invoked the compelling state interest test in reviewing durational residence requirements. *State v. Wylie*, 516 P.2d 142, 147 (Alaska 1973); *see, e.g., Hicklin v. Orbeck*, 565 P.2d 159, 166 (Alaska 1977), *rev'd on other grounds*, 437 U.S. 518, 98 S.Ct. 2482, 57

L.Ed.2d 397 (1978); *Thomas v. Bailey*, 595 P.2d 1, 10 (Alaska 1979) (Rabinowitz, J., concurring). In *Zobel I* and *Zobel II*, however, we announced a new framework for the examination of migration rights under the state constitution. In *Zobel II* we stated:

[W]e will no longer regard all durational residency requirements as automatically triggering strict scrutiny and requiring a showing that such a classification is absolutely necessary to promote a compelling state interest. Instead, we will balance the nature and extent of the infringement on this right caused by the classification against the state's purpose in enacting the statute and the fairness and substantiality of the relationship between that purpose and the classification.

619 P.2d at 453 (footnote omitted). Because in *Zobel II* we concluded that the right to migrate into Alaska was not penalized in any respect by the legislative scheme at issue, we applied the lowest level of review under *Erickson*. 619 P.2d at 458–60.

**11.** There is no requirement to demonstrate actual deterrence of the right to travel in state or federal law. *Zobel II*, 619 P.2d at 458 & n. 32. The relevant criteria are the fact and the severity of the restriction.

from reaping a "windfall" in real terms through the exportation of Alaska benefits to the respective economies of our sister states. The parties' contentions regarding whether the right to travel is burdened by § 175(d) and the extent of that burden are related both to the selection of the standard of review and the question of whether the statute is fairly designed to accomplish its purposes. We will therefore defer discussion of this point until a discussion of the statutory purposes.

### A. The Purposes Furthered by AS 23.-30.175(d).

According to appellants, two broad categories of purposes are served by the adjustment provision. First, AS 23.30.175(d) achieves a "reduction of the cost of insurance premiums" paid by Alaska employers. Second, it is designed to align benefit levels to the economic environment of the recipient. ALPAC and the State argue that this serves to eliminate distortions and discriminations which would otherwise occur, in contravention of fundamental premises of workers' compensation.

We hold that the asserted goal of lowering insurance premiums can have no independent force in the state's attempt to meet its burden under the equal protection clause. Although reducing costs to taxpayers or consumers is a legitimate government goal in one sense, savings will always be achieved by excluding a class of persons from benefits they would otherwise receive. Such economizing is justifiable only when effected through independently legitimate distinctions.[12]

The second goal proffered by the state and ALPAC is that AS 23.30.175(d) attempts to adjust benefit levels to the economic environment of recipients. The premise here is that a specified amount of money is worth something different in another state than it is in Alaska. Taking Brown's case as an example, the argument would be that the $212 weekly payment received by Brown in California has the same real value as the $552 he would have received in Alaska.

Appellants argue that adjustment to the wage levels in the recipient's locality is an important state goal for two reasons. First, they claim that Alaska-level benefits lose their relation to prospective earning capacity when a recipient moves to a different economic environment. According to ALPAC and the State, we are bound to recognize that a recipient's earning power varies with his place of residence.

Second, appellants point to a functional objective of disability compensation which would be frustrated if out-of-state recipients were allowed to receive benefits outstripping their geographically-determined earning power. The state argues that "[a]nother major goal of the workers' compensation system is the rehabilitation of the injured worker." Consistent with this goal, appellants assert that the state has a strong interest in ensuring that benefit levels are not so high for some recipients that they discourage the recipients from returning to work.[13]

We do not accept appellants' premise that earning power is exclusively determined by place of present residence. A

12. In *Plyler v. Doe,* 457 U.S. 202, 227, 102 S.Ct. 2382, 2400, 72 L.Ed.2d 786, 806 (1982), the Supreme Court stated that "a concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources." Earlier precedent held that fiscal considerations could not be used to explain invidious classifications. *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 263, 94 S.Ct. 1076, 1084, 39 L.Ed.2d 306, 318 (1974); *Graham v. Richardson,* 403 U.S. 365, 374–75, 91 S.Ct. 1848, 1853–54, 29 L.Ed.2d 534, 543 (1971); *Shapiro v. Thompson,* 394 U.S. 618, 633, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600, 614 (1969).

13. *Cf. Richardson v. Belcher,* 404 U.S. 78, 83–84, 92 S.Ct. 254, 258–259, 30 L.Ed.2d 231, 235–36 (1971) (upholding offset provision in federal social security act reducing social security benefits for recipients also receiving workers' compensation). AS 23.30.187 ("Compensation is not payable to an employee under [the permanent and temporary total disability statutes] for a week in which the employee receives unemployment benefits") appears to serve a similar purpose.

flaw runs through each of appellants' arguments regarding the importance of the state's interest in the goal of adjusting benefit levels to the economic environment of the recipient. It must be remembered that the statute pursues equality in terms of the prospective pre-injury earning capacity of each recipient. We think it unsupportable to redefine earning capacity when a recipient changes his geographical residence. A worker's earning capacity is primarily determined both by the worker's skills and by his or her ability to seek out markets for his or her labor. As Brown points out, the members of the plaintiff class "have a demonstrated capacity to travel to high wage areas." [14]

Yet we agree that the State has important interests in avoiding disincentives to rehabilitation and in creating incentives for injured workers to go back to work, and we agree that the effectiveness of these incentives may depend on the cost of living in the state in which the worker lives. The mechanism by which the Alaska Workers' Compensation Act generally protects the state interests in rehabilitation and return to work is by setting benefit levels for each recipient below what he or she was actually making at the time of injury. *See* AS 23.30.175(a). As a general proposition lower benefit levels will carry a lesser danger of disincentive no matter where the recipient is located. However, if an injured worker is able to live in an area where the general cost of living is much lower than in Alaska, the worker's unadjusted compensation benefits may in terms of real income be in excess of the actual wage he or she received when employed, and paying the worker unadjusted amounts of benefits may actually discourage a return to work.

B. *Application of Standard of Review.*

■■■ Under our equal protection analysis we examine "the closeness of the

means-to-ends fit" between the legislation and its purported goals. *Ostrosky*, 667 P.2d at 1193. Accepting the proposition that the legislature may attempt to adjust the benefits of workers' compensation recipients based on their economic environment as defined in terms of geographic location, it remains to be determined whether AS 23.30.175(d) is well designed to achieve this objective. We hold that section 175(d) imposes a substantial penalty upon the exercise by Brown and the plaintiff class of the right to travel out of Alaska. Accordingly, the burden on the state to justify this legislation is a very high one.

■■■ When examining section 175(d)'s impact on the right of interstate migration, the relevant questions are whether section 175(d) operates in such a way that the reasonable recipient would be deterred from exercising the right to travel, and the degree of that deterrence.[15]

■■■ The State argues that injured workers who leave Alaska and thus come within the coverage of section 175(d) are really in no worse a position than workers who stay within the state and continue to receive unadjusted benefits. The State's rationale is that workers within Alaska receive benefits which reflect wages they could be earning in Alaska but for their injury, and workers within other states receive benefits related to the money they could be earning in their particular state if they were suddenly returned to health. Thus the State argues that section 175(d) recipients are in the same position as other recipients, and the exercise of their travel rights is not deterred.

An extension of the State's argument is that workers' compensation recipients will not be inhibited in exercising their migration rights by the fact that their benefits out of Alaska will be lower than benefits within Alaska. The recipients will be satis-

---

**14.** If we posit the example of a pipe-fitter injured in Alaska who chooses to convalesce in Oregon, we think that the fact of his repose in Oregon casts no inference concerning his inclination to return to work in Alaska if he were healthy.

**15.** We follow the federal rule that no showing of actual deterrence need be made. The standard is an objective one. *See supra* note 11.

fied, at least to the extent that their travel decisions will not be influenced, with the knowledge that their benefits bear the same relation to the average wages of their state of residence as they would have borne to Alaska wages had they remained in Alaska. We think that this is an unrealistic and untenable view of section 175(d)'s impact upon the interstate movement of disability recipients.

The appellants' argument regarding the degree to which section 175(d) penalizes the right to travel would be more persuasive if the adjustment calculation were based upon reasonably accurate cost of living statistics from other states rather than upon wage levels in those states. If there were a way to equalize the buying power of benefit dollars in each state we would have difficulty in concluding that recipients would thereby suffer any penalty despite a reduction in actual dollars paid to out-of-state workers.

In holding section 175(d) unconstitutional, the superior court found that "the reduction in the average weekly wage which occurs when one travels from Alaska to the other States exceeds the reduction which results in the cost of living." Relying on a 1975 report of the Alaska Legislative Affairs Agency, the superior court concluded that a disabled worker "who moved in 1974 from Anchorage to a location in another State stood to suffer an average benefit reduction of approximately 142% of the reduction in the cost of living." The court stated that no reason had been advanced, and it could think of none, for supposing that the reduction in recipients' purchasing power effected by section 175(d) had done anything other than gotten worse since 1975. Based upon its comparative analysis of the statistics, the superior court ,found that "disabled workers are strongly deterred from exercising their constitutional right to travel and take up residence in another State."

The response made by ALPAC and the State to the superior court's finding is an indirect one. Appellants argue that it was not feasible for the legislature to key section 175(d)'s adjustment to cost of living statistics because no reliable statistics of this kind exist. Further, the cost of living statistics published by the United States Department of Labor will no longer be available after 1982. Thus appellants contend that the legislature could not have incorporated those statistics into section 175(d).

Accepting for purposes of argument the inadequacy of all available cost of living statistics, this fact does not justify the substitution of a different statistical base and the measure of a different economic variable. Both sides apparently concede that there is no necessary correlation between wages and cost of living. AS 23.30.175(d) will therefore always carry with it the risk that the adjustment it effects will overcompensate for any cost of living differential that exists between Alaska and other states. The State notes that there is an "up side" to this risk, in that workers who move to a state where wages in relation to those in Alaska are higher than the relative cost of living will receive more in actual benefit value than they would receive in Alaska. However, this does not vitiate the finding of penalty made by the superior court. The risk of severe benefit reductions based upon variations in economic conditions which do not reflect the purchasing power of benefit dollars is a significant penalty in itself. By all appearances the current effect of section 175(d) is arbitrarily to over-deflate benefits for actual cost of living differentials. It is thus evident that the "down side" of the risk created by the incorporation of wage figures is quite real.

We conclude that the State has failed to meet its high burden. We affirm that portion of the superior court's opinion invalidating former AS 23.30.175(d) on state equal protection grounds. Because we do not view the 1982 and 1983 amendments to section 175 as materially altering the provision within the analysis of this decision, we hold also that AS 23.30.175(c) as currently enacted is also invalid.

## II. DAMAGES

Upon declaring former AS 23.30.175(d) unconstitutional, the superior court assessed damages against ALPAC for the additional benefits members of the plaintiff class would have received if section 175(d) had not been enacted. ALPAC argues on appeal that it is a private entity and should not be found liable in damages for its good faith compliance with a statute.

There are three conceivable causes of action available to Brown in this case which might support a damages suit against AL-PAC. Under the federal law, 42 U.S.C. § 1983 subjects "any person" to damages liability who "under color of state law" deprives another of federally-guaranteed rights.[16] Aside from section 1983, it is now well established in the federal courts that some provisions of the United States Constitution may be enforced in a suit for damages even in the absence of a specific statute supplying a cause of action. *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (eighth amendment); *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (fifth amendment); *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (fourth amendment). Finally, Brown suggests that we should find a *Bivens*-type implied damages remedy is available under the state constitution. *See King v. Alaska State Housing Authority*, 633 P.2d 256, 259–61 (Alaska 1981).

Assuming the existence of all three rights of action outlined above, it is next necessary to determine whether ALPAC is a proper defendant. Here Brown's claim encounters a major obstacle. Under all three theories it is necessary that ALPAC acted in some way which caused injury to the plaintiff class. Based upon Brown's arguments, it is difficult to identify what conduct on the part of ALPAC should be held to give rise to liability.

Brown argues at length that the adjustment scheme in section 175(d) is the product of state action, and that ALPAC should therefore be vulnerable to a suit in damages. It is hornbook law that most of the rights secured by the constitution are protected only against governmental infringement. *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 156, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185, 193 (1978); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349, 95 S.Ct. 449, 452, 42 L.Ed.2d 477, 483 (1974). Private parties may sometimes be subjected to suit because they have usurped or assumed functions traditionally exercised only by the government, or because their actions were taken in collaboration with action by the state. *See Gerena v. Puerto Rico Legal Services, Inc.*, 697 F.2d 447, 449–52 (1st Cir.1983).[17] Even in

---

**16.** 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**17.** *See also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). The *Lugar* Court reviewed two prerequisites that exist for the right to sue a private party under 42 U.S.C. § 1983:

First, the deprivation must be caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state. Without a limit such as this, private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them.

at 937, 102 S.Ct. at 2754, 73 L.Ed.2d at 495. The lower federal courts have been active in the short time since the *Lugar* decision in interpreting the "state actor" requirement. *See Coleman v. Turpen*, 697 F.2d 1341, 1345 (10th Cir.1983); *Gerena, supra*, at 449–52; *Adams v. Bain*, 697

cases where a cause of action is found to lie against a private party for the violation of the constitutional rights of another, it is a substantial additional leap to find that the private defendant may be liable in damages. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 942 n. 23, 102 S.Ct. 2744, 2757 n. 23, 73 L.Ed.2d 482, 499 n. 23 (1982); *Adickes v. Kress & Co.,* 398 U.S. 144, 174 n. 44, 90 S.Ct. 1598, 1617 n. 44, 26 L.Ed.2d 142, 163 n. 44 (1970). The Supreme Court in *Lugar,* although not passing upon the issue, suggested that there should be an affirmative defense for "private individuals who innocently make use of seemingly valid state laws." 457 U.S. at 942 n. 23, 102 S.Ct. at 2757 n. 23, 73 L.Ed.2d at 499 n. 23.

The general rule against private party liability for constitutional transgressions has particular force in the setting of this case. Were we to hold ALPAC liable in damages, we would in effect be creating an affirmative duty running to private persons to disobey unconstitutional statutes in advance of a judicial determination of the laws' validity.[18] This we are reluctant to do.

▬▬▬ We therefore conclude that private entities who regulate their behavior in good faith compliance with a validly enacted law cannot by the fact of their compliance be held legally responsible for constitutional defects in the law. We hold that the award of damages against ALPAC cannot be sustained.[19] The decision below is AFFIRMED in part, and REVERSED in part, in accordance with this opinion.

MOORE, J., not participating.

COMPTON, Justice, dissenting.

I dissent from the court's holding that former AS 23.30.175(d) violates the equal protection clause of the Alaska Constitution.

First, I object to the court's conclusion "that section 175(d) imposes a substantial penalty upon the exercise by Brown and the plaintiff class of the right to travel out of Alaska." 687 P.2d at 273 (Alaska 1984). I acknowledge that a reduction in workers' compensation may influence an injured worker's decision on whether to convalesce outside of Alaska; however, I do not believe that section 175(d) actually penalizes a person's right to travel.

The interest of an injured worker convalescing outside of Alaska in receiving the same benefits as he would receive were he convalescing in Alaska is placed in its prop-

---

F.2d 1213, 1217 (4th Cir.1982); *Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1332–35 (11th Cir.1982) (Hoffman, District Judge, concurring); *Earnest v. Lowentritt,* 690 F.2d 1198, 1200–02 (5th Cir.1982).

**18.** The class action complaint filed by Brown against ALPAC illustrates the difficulty of this point. Brown alleged that, "[a]s a result of the enactment and enforcement of AS 23.30.175, [ALPAC] has wrongfully withheld monies due and owing Plaintiff BROWN and all other members of the class." ALPAC neither enacted section 175, nor was responsible for its enforcement. Second, Brown's complaint stated that "[ALPAC] has been unjustly enriched in an amount equal to the difference between the benefits actually paid to Plaintiff and other class members, and the benefits which would have been paid if the Plaintiff and other class members had resided in the State of Alaska at the time of payment." Brown's factual assertion on this score, however, ignores the relationship between benefits paid by the insurance carrier and premiums assessed against the employer. Brown has cited no evidence for the proposition

that ALPAC continued to collect premiums at the same level after the passage of the adjustment provision as before. Indeed, one of the two major purposes behind section 175(d) was the reduction of employer premiums. Third, Brown alleged that "[ALPAC], acting under color of the authority conferred upon it by the laws of the State of Alaska, and in particular, Alaska Statute 23.30.175, has been, and is currently, discriminating against Plaintiff and other nonresident workmen's compensation benefit recipients solely because of their status as nonresidents." Again, Brown's charges amount to nothing more than the fact that ALPAC complied with the law. No discriminations other than those mandated with mathematical specificity by section 175 have been attributed to ALPAC.

**19.** However, the prospective effect of the superior court's judgment is unaffected by this conclusion. From and after the effective date of the judgment appellant and the other class members are entitled to the payments they would have received except for the unconstitutional provisions of § 175.

er perspective by comparing this statute with statutes that have been found to penalize the right to travel. The United States Supreme Court has invalidated statutes challenged under the federal equal protection clause because they penalized the right to travel in only three cases, *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), and *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The classifications in these cases differ from section 175(d) in several respects.

First, in all three cases, the classifications denied either a "basic necessity of life" (*Maricopa County* (nonemergency health care) and *Shapiro* (welfare benefits)) or a "fundamental political right" (*Dunn* (voting)). In this case, the classification denies neither a basic necessity of life nor a fundamental political right. Furthermore, the statute does not *deny* workers' compensation benefits, but at most only *reduces* the amount received. Even with the reduction, Brown received about $11,000 per year, which is $3,000 *more* than the maximum amount available under the California workers' compensation system.

The second distinction is that *Maricopa County, Dunn,* and *Shapiro* all involved durational residency requirements, i.e., whether a state may deny certain benefits or privileges to new residents which are enjoyed by its "old" residents, until they have been residents for a specified period. Section 175(d) does not impose any durational requirement, nor is it even a "residency requirement" in the usual sense of the phrase.[1] Even if it were, a state generally is much more able to distinguish between residents and non-residents than between long and short term residents. *Wil-*

*liams v. Zobel,* 619 P.2d 448, 451 n. 7 (1980), *rev'd on other grounds,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982), *citing Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63; *Fisher v. Reiser,* 610 F.2d 629 (9th Cir.1979).

The Nevada statute challenged in *Fisher v. Reiser* is similar to section 175(d). The statute granted cost of living increases to workers' compensation recipients who resided in Nevada, but not to those who were no longer Nevada residents. The court noted that "[i]n *Shapiro, Dunn,* and *Maricopa County,* the issue involved the obligation and responsibility of the claimant's new state of residence; here the claimants seek to enforce an obligation against the state of former residence. The distinction is critical." 610 F.2d at 633. In support of its conclusion that the obligation to new residents imposed under *Shapiro* and *Maricopa County* does not automatically extend to former residents, the court in *Fisher* cited to *Califano v. Torres,* 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978). In that case, the Supplemental Security Income Act provided SSI benefits only while the claimant resided in a state or the District of Columbia. Torres lost his benefits upon moving to Puerto Rico. The Court stated:

> As the Court said in Memorial Hospital, "the right of interstate travel must be seen as insuring new residents the same right to vital governmental benefits and privileges in the States to which they migrate as are enjoyed by other residents." [*Memorial Hospital v. Maricopa County,* 415 U.S. at 261 [94 S.Ct. at 1084], 39 L.Ed.2d at 317.]

In the present cases the District Court altogether transposed that proposition. It held that the Constitution requires that a person who travels to Puerto Rico must be given benefits superior to those enjoyed by other residents of Puerto

---

1. 8 AAC 45.900(b) provides:
   In AS 23.30.175, "resides" means abides, dwells, inhabits, or lives. In applying the term to the facts of a specific case, the inquiry will be directed largely toward determining with what jurisdiction's economy the employee must contend.

Therefore, "residence" does not mean "domicile" (presence plus intent to remain); the benefits of recipients domiciled outside of Alaska but living in Alaska are not reduced, whereas the benefits of recipients who are domiciled in Alaska but living outside of Alaska are reduced.

Rico if the newcomer enjoyed those benefits in the State from which he came. This Court has never held that the constitutional right to travel embraces any such doctrine, and we decline to do so now.

435 U.S. at 4, 98 S.Ct. at 908, 55 L.Ed.2d at 68–69 (footnote omitted).

Although the courts in *Fisher* and *Torres* applied the federal equal protection test, I believe they are persuasive in pointing out that there is no constitutional right for benefits received in one state to continue after the person has left that state. As the State notes in its brief, "a state certainly need not encourage injured workers to leave the state for destinations where they can live more inexpensively and continue to collect Alaska compensation benefits that are higher than the wages they would earn if working. Nor should Alaskan consumers, who ultimately bear the cost of the premiums, be burdened with financing these excesses." In my opinion, the statute does not penalize Brown's right to travel. Rather, it attempts to prevent him from receiving an economic windfall when he moves to a state with a lower cost of living.

Second, I object to the court's rejection of the state's objective of fostering rehabilitation by adjusting benefits when convalescence occurs outside of Alaska. It cannot be disputed that a major goal of the workers' compensation system in general is the rapid rehabilitation of an injured worker so that he or she can return to work. *See* 1 A. Larson, The Law of Workmen's Compensation § 2.50, at 11–12 (1982). One reason most states award an injured worker only a percentage of his wages is because excessive benefits may hamper the incentive to return to work, and encourage him to malinger. Given that Alaska benefits are based on Alaskan wages, which are higher than wages in most states, receiving these benefits in other states would frustrate the rehabilitation goal because it would be more profitable to receive benefits than to work. Adjusting the wages so that they are closer to the wages in the state of residence removes or lessens the incentive to malinger.

It is true, as the court's opinion notes, that just because an injured worker convalesces in a certain state does not mean he will work in that state after recovery. 687 P.2d at 273, n. 14. It is equally presumptuous, however, to assume that the worker will return to Alaska and find another high-paying job after he is rehabilitated. If an injured worker were allowed to receive the full two-thirds of his pre-injury salary (up to $49,000 per year) while living in a state with a much lower cost of living, I suspect that his incentive to work in any state, including Alaska, would be greatly diminished. By adjusting the benefit levels to more accurately reflect the economic conditions of the state of convalescence, the injured worker's incentive to return to work, no matter where that is, will be enhanced. Thus, section 175(d) substantially furthers the legitimate goal of rehabilitation, and on this ground, the statute should be upheld.

The superior court agreed that section 175(d) furthers this objective, but invalidated the statute on the ground that the objective could have been accomplished by using a less restrictive alternative to the chosen means. Rather than adjusting benefits based on average weekly wage data, the superior court believed that using the cost of living data would have accomplished the same objective more accurately. The court stated:

In the Fall of 1973, the average annual cost of living for a four member family in Anchorage with an intermediate budget was $16,520, compared to a national urban average for such a family of $12,626. Thus, the national urban average cost of living was 76% of the Anchorage cost, a reduction of 24%. In 1974, the published average weekly wage for Alaska was $248.00, compared to an average weekly wage outside Alaska of $162.93. Thus, the average weekly wage outside Alaska was only 66% of the Alaskan average, a reduction of 34%.

The court concluded that this ten percent difference between the two formulas causes a "severe reduction in the purchasing power, in real terms, of the monetary benefits paid to disabled non-residents," but not to Alaska residents, and therefore injured workers are deterred from residing in another state.

In my opinion, it was error for the superior court to invalidate section 175(d) on this ground. First, cost of living statistics do not provide a workable alternative to average weekly wage statistics. Cost of living statistics are based on hypothetical family budgets for only twenty-eight urban areas and thus cannot accurately determine the actual cost of living in the area in which the injured worker convalesces. A more practical problem with using cost of living statistics is that they have been discontinued.[2]

Second, although using average weekly wage data is an imperfect measure of cost of living differentials, a perfect fit between means and ends is not required. Requiring compulsively neat logical correlations between classification and objective would ignore legitimate demands for legislative flexibility. Gunther, *Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv.L.Rev. 1, 21 (1972). *See also Rose v. Commercial Fisheries Entry Commission*, 647 P.2d 154, 159–60 (Alaska 1982); *Commercial Fisheries Entry Commission v. Apokedak*, 606 P.2d 1255, 1267 (Alaska 1980).

Although the adjustment is not perfect, I believe that section 175(d) is an acceptable attempt to meet acknowledged differences in the economic conditions of Alaska and other states. The equal protection clause requires that all individuals, similarly situated, be treated alike. As the State asserts:

> Rather than taking identically-situated individuals, and treating them dissimilarly, AS 23.30.175(d) has the opposite effect; that is, the benefits of individuals who *should* receive comparable compensation, but absent the statute, would not, because of the disparate wage levels and living costs of their places of residence, are adjusted to account for those circumstances.

If there were no statutory adjustment, recipients who remain in Alaska would be placed at a disadvantage when compared to those recipients because the cost of living is twenty four percent higher in Alaska than the national urban average.

In sum, the distinction between residence and non-residence is really a distinction between the economic conditions with which benefit recipients must contend, and is a rough attempt by the state to be neutral to recipients living in and outside of Alaska. This attempt seems to be the most fair and workable alternative. One could imagine a harsher alternative. For example, a statute that requires all benefits to be allocated only on the basis of the state of continued residence, rather than on the state of injury; under section 175(d)'s formula, Alaska's higher wages are always factored into the ratio and therefore an injured worker would always receive more under section 175(d) than under this hypothetical statute.[3] In this sense, he is always "rewarded" for his initiative to migrate to Alaska. When viewed from this angle, and considering how dissimilar this classification is from other classifications that have been invalidated under the Alaska and federal

---

**2.** The Autumn 1981 Urban Family Budget, released April 16, 1982, by the United States Department of Labor, Bureau of Labor Statistics, states:

> This is the last release of four-person family budget data. The Bureau of Labor Statistics eliminated the program as part of the recent budget reduction. The expenditure data on which the budgets are based are now 20 years old. Continuation of the program would have required revision of concepts and expenditure data and extensive price collection, for which funding was not available.

**3.** For example, under the hypothetical statute, the maximum amount Brown would receive is $154.00 per week (using the California rates); the amount he received under section 175(d) was $211.91 per week.

equal protection clauses, I would hold that this statute is constitutional.