*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| THOMAS J. KNOLMAYER, M.D., ALASKA TRAUMA AND ACUTE CARE SURGERY, LLC, | Supreme Court No. S-17792 |
| Petitioners, | Superior Court No. 3AN-16-04601 CI |
| v. | O P I N I O N |
| CHARINA MCCOLLUM, JASON MCCOLLUM, | No. 7631 – November 18, 2022 |
| Respondents. | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Herman G. Walker, Jr., Judge.

Appearances: Howard Lazar and Whitney L. Wilkson, Delaney Wiles, Inc., Anchorage, for Petitioners. Margaret Simonian, Dillon & Findley, P.C., Anchorage, and Michael Cohn, Phillip Paul Weidner & Associates, Anchorage, for Respondents. Christian N. Bataille, Flanigan & Bataille, Anchorage, for Amicus Curiae Alaska Association for Justice. Ian S. Birk, Keller Rohrback L.L.P., Seattle, Washington, and Eva Gardner, Ashburn & Mason P.C., Anchorage, for Amicus Curiae Premera Blue Cross.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan, Justices.

BORGHESAN, Justice.

# I.     INTRODUCTION

Alaska Statute 09.55.548(b) provides that when a medical malpractice claimant's losses have already been compensated in part by a collateral source (such as an insurer), the claimant's damages award will be reduced by the value of the collateral source compensation, except when the collateral source is a "federal program that by law must seek subrogation." This case presents the questions of whether and how the statute applies when the claimant's losses are compensated by an employer's self-funded health benefit plan governed by the federal Employee Retirement Income Security Act (ERISA).[1]

We conclude that an ERISA plan does not fall within the statute's "federal program" exception. Therefore AS 09.55.548(b) requires a claimant's damages award to be reduced by the amount of compensation received from an ERISA plan. But we also conclude that the distinction the statute draws between different types of medical malpractice claimants is not fairly and substantially related to the statute's purpose of ensuring claimants do not receive a double recovery — an award of damages predicated on losses that were already compensated by a collateral source. Because insurance contracts commonly require the insured to repay the insurer using the proceeds of any tort recovery, claimants with health insurance are scarcely more likely to receive a double recovery than other malpractice claimants. The statute therefore violates the equal protection guarantee of the Alaska Constitution.

---

[1]     29 U.S.C. § 1001 *et seq.*  ERISA comprehensively regulates employee welfare and pension benefit plans "to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320-21 (2016).

## II.   FACTS AND PROCEEDINGS

### A.   Facts

Plaintiff Charina McCollum alleges that in May 2015 Dr. Thomas Knolmayer, M.D., mistakenly cut the wrong duct during a surgery to remove McCollum's diseased gallbladder.  As a result McCollum was medevacked from Anchorage to Seattle, where she was given a drain to evacuate bile from her abdomen until she could have duct repair surgery.  Due to problems with bile drainage in June 2015 she was again medevacked from Anchorage to Seattle and the drain was replaced. In August 2015 the duct was surgically repaired.

McCollum's husband Jason McCollum was employed by Lowe's Companies, Inc., and most of McCollum's health care expenses were paid by a health plan administered by Lowe's.  The terms of the Lowe's Plan include a right to subrogation, under which the Plan "may, at its discretion, . . . commence a proceeding or pursue a claim against any party" for the recovery of all benefits paid by the Plan.  The Plan's terms also give it a right to reimbursement from any damages award McCollum might recover for her injury:

> The Plan shall be entitled to recover 100% of the benefits paid, without deduction for attorneys' fees and costs or application of the common fund doctrine, make whole doctrine or any other similar legal theory, without regard to whether the Covered Person is fully compensated by his or her recovery from all sources.  The Plan shall have an equitable lien which supersedes all common law or statutory rules, doctrines and laws of any State prohibiting assignment of rights which interferes with or compromises in any way the Plan's equitable subrogation lien.  The obligation exists regardless of how the judgment or settlement is classified and whether or not the judgment or settlement specifically designates the recovery or a portion of it as including medical, disability or other expenses.  If the Covered

Person's recovery is less than the benefits paid, then the Plan is entitled to be paid all of the recovery achieved.

## B. Proceedings

In February 2016 McCollum filed a complaint for medical malpractice against Knolmayer and Alaska Trauma and Acute Care Surgery, LLC.

### 1. The superior court's first order on preemption

McCollum moved for a ruling of law on the recoverability of her medical expenses that had been paid by the Lowe's Plan. Alaska Statute 09.55.548(b) provides that "a claimant may only recover damages from the defendant that exceed amounts received by the claimant as compensation for the injuries from collateral sources," with the exception of "death benefits paid under life insurance" or collateral sources that are "federal program[s] that by law must seek subrogation." McCollum's motion argued that as an employer-funded benefit plan, the Lowe's Plan is governed by ERISA, which preempts state laws relating to employee benefit plans. McCollum asked the court "to hold that ERISA [preempts] the application of AS 09.55.548(b) in this case, and that [McCollum] is not precluded from requesting medical damages that include the expenditures of the" Lowe's Plan.

Knolmayer opposed McCollum's motion, arguing that ERISA does not preempt AS 09.55.548(b). Knolmayer claimed that although ERISA does preempt some state laws, "state laws that do not affect coverage or impose requirements upon ERISA plans are not preempted."

In reply McCollum argued that AS 09.55.548(b) is preempted because it affects the Lowe's Plan's contractual subrogation and reimbursement rights. To support this argument McCollum pointed to a letter from the Plan's representative, the PHIA Group, to McCollum's counsel stating that "at the time of settlement or resolution of any underlying claims, [the Plan] will seek full reimbursement of all related claims paid by

the Plan." At oral argument, McCollum explained that because AS 09.55.548(b) limits the amount that McCollum can recover from the defendants, it also potentially limits the amount the Lowe's Plan can recover from McCollum. She argued that because AS 09.55.548(b) would result in the Lowe's Plan recovering less from claimants in Alaska than from claimants in states without similar statutory provisions, the statute impairs ERISA's goal of uniform health plan administration across the country. Knolmayer, on the other hand, argued that AS 09.55.548 "only governs the defendant's liability to the plaintiff. It does not prevent the [P]lan in any way from seeking reimbursement from the plaintiff after this lawsuit has concluded."

On October 1, 2018, the court issued an order holding that ERISA does not preempt AS 09.55.548(b). The order stated that under AS 09.55.548(b), the plaintiff's award is reduced by the amount the insurer paid in medical expenses; that amount is then "set aside by the court to reimburse the insurer." According to the superior court, because the statute did not "prevent the [Plan] from seeking or receiving reimbursement," it did not affect the operation of ERISA plans and therefore was not preempted by ERISA.

### 2. The superior court's order on partial reconsideration

Knolmayer sought partial reconsideration of the October 1 order. He did not challenge the court's conclusion that ERISA does not preempt AS 09.55.548. But he sought reconsideration of the court's holding that the amount deducted from the plaintiff's recovery would be "set aside" to reimburse the insurer. Knolmayer argued that this "set-aside" would contradict the statute's purpose of reducing the size of medical malpractice awards, as well as contradict the common law by allowing the subrogated insurer to obtain a recovery that the plaintiff herself could not recover. McCollum opposed the motion. She argued that under Knolmayer's interpretation of AS 09.55.548(b), the Lowe's Plan would be able to "seize" her entire recovery, thus

"eviscerat[ing]" the "basic principle of tor[t] law that individuals have basic interests protected by law in the event of civil wrong."

The court granted partial reconsideration on June 25, 2019. It agreed with Knolmayer that AS 09.55.548(b) "forecloses collection of the Plan's subrogated interest against Defendants *by Plaintiff*."[2] It therefore vacated "those portions of its Order that set out a post-trial procedure for earmarking covered medical costs and awarding them to the non-party Plan." However, the court noted that "nothing in AS 09.55.548(b) prevents the Plan from recovering on its subrogated interest as a party itself." The court stated that unless the Lowe's Plan joined as a party, McCollum could not "pursue the covered medical costs, regardless of the contract between [McCollum] and the Plan." But the court determined that "[t]he Plan's subrogation right has not been eliminated by the statute," and that the Plan was still free to join the present action or to bring its own action against the defendants.

### 3.     The superior court's clarification order

McCollum then moved for clarification of the court's reconsideration order, asking whether the Lowe's Plan could assign its subrogated claim to her. The defendants opposed, urging the court to find that even if McCollum received an assignment of the Lowe's Plan's subrogated claim, her recovery on the claim would still be limited by AS 09.55.548(b). The court denied the motion as a request for an advisory opinion.

In October 2019 McCollum filed a notice to the court that she had "agreed to an assignment from" the Lowe's Plan and that the "actual assignment w[ould] be completed in the near future." Knolmayer responded, arguing that the Plan had to join the action as a party itself in order to recover the Plan's expenditures. McCollum replied

---

[2]     Emphasis in original.

by asking the court whether the proposed assignment would be valid, stating that if it would not be, she would instead seek involuntary joinder of the Lowe's Plan.

In November 2019 McCollum moved to join the Lowe's Plan's representative, the PHIA Group, as a co-plaintiff. The defendants opposed, arguing that the Lowe's Plan had exercised its option to ratify McCollum's action instead of joining it and could not be forced to join. They further argued that any claim brought by the Plan would be barred by the statute of limitations. In May 2020 the court denied McCollum's motion for joinder.

On April 30, 2020, the court issued an "Order Vacating & Clarifying Orders Re: ERISA Preemption of AS 09.55.548 & Denying Plaintiff's Motion." The order stated that because of the parties' confusion regarding the earlier rulings on ERISA preemption, "the Court vacates its previous orders (issued October 1, 2018 and June 25, 2019) and clarifies its holding for the record: ERISA does not preempt AS 09.55.548, and AS 09.55.548 applies to this case." The court held that AS 09.55.548(b) did not prevent McCollum from recovering the medical expenses paid by the Lowe's Plan because the Plan falls under the statute's exception for federal programs that by law must seek subrogation. The court reasoned that because the Plan is an employee welfare benefit program governed by ERISA, it is a "federal program." And it reasoned that according to the terms of McCollum's contract with the Plan and the Plan's letter to McCollum's counsel, "the plan is also *required* to seek subrogation and reimbursement."[3] Thus, "[b]ecause Ms. McCollum's federally-governed health insurance plan constitutes a 'federal program that by law must seek subrogation' under the statute, evidence of any compensation or payments from her plan is not admissible and her damages may not be reduced based on payments received from those sources."

---

[3] Emphasis in original.

### 4. Petition for review

In May 2020 Knolmayer petitioned for review of the superior court's April 30 order, specifically the court's "holding that [the Lowe's Plan] is a 'federal program that by law must seek subrogation' under AS 09.55.548(b)."

We granted the petition, posing the following questions to the parties and inviting the participation of amici curiae:[4]

- First, is the Lowe's Plan part of a "federal program required by law to seek subrogation" for purposes of AS 09.55.548(b)?

- If not, does AS 09.55.548(b) bar a medical malpractice plaintiff from recovering damages paid by a contractually subrogated insurer?

- Can an insurer assign a contractually subrogated claim to a plaintiff for collection purposes in a medical malpractice lawsuit, and was there an effective assignment in this case?

- Does AS 09.55.548(b) as applied to a plaintiff whose insurer has a contractual right to collect from the plaintiff's recovery violate the due process or equal protection guarantees of the Alaska Constitution? Or does AS 09.55.548(b) require that such contractual subrogation rights be invalidated?[5]

## III. STANDARD OF REVIEW

Deciding the correct interpretation of AS 09.55.548, whether the statute's operation may be avoided by the use of assignment, whether this statute is preempted by

---

[4] We thank amici Alaska Association for Justice and Premera Blue Cross for their helpful briefing.

[5] *See Knolmayer v. McCollum*, No. S-17792 (Alaska Supreme Court Order, Sept. 29, 2020).

ERISA, and whether the statute violates the Alaska Constitution are questions of law that we review de novo.[6]

## IV.   DISCUSSION

### A.   AS 09.55.548(b)'s Bar On Recovering Damages Compensated By A Collateral Source Raises Difficult Questions About Allocation Of Loss When The Collateral Source Has Rights Of Subrogation And Reimbursement.

This case concerns how AS 09.55.548(b) affects the recovery of damages in a medical malpractice case when the plaintiff's medical expenses have been paid in part by an employer's self-funded health benefit plan governed by ERISA.

Historically, a plaintiff's damages award against a tortfeasor could not be "diminished or mitigated on account of payments received by plaintiff from a source other than the defendant."[7]   The so-called "collateral source rule" was "based on the principle that a tort-feasor is not entitled to have his [or her] liability reduced merely because plaintiff was fortunate enough to have received compensation for his [or her] injuries or expenses from a collateral source."[8]   The rule prevented the admission of

---

[6]   *Alaska Pub. Offs. Comm'n v. Not Tammie*, 482 P.3d 386, 388 (Alaska 2021) (statutory interpretation); *Catalina Yachts v. Pierce*, 105 P.3d 125, 128 (Alaska 2005) (federal preemption); *Ruggles ex rel. Estate of Mayer v. Grow*, 984 P.2d 509, 512-13 (Alaska 1999) (relationship of assignment to subrogation); *Forrer v. State*, 471 P.3d 569, 583 (Alaska 2020) (constitutional interpretation).

[7]   *Weston v. AKHappyTime, LLC*, 445 P.3d 1015, 1021 (Alaska 2019) (quoting *Beaulieu v. Elliott*, 434 P.2d 665, 673 (Alaska 1967)).

[8]   *Id.* (alterations in original) (quoting *Ridgeway v. N. Star Terminal & Stevedoring Co.*, 378 P.2d 647, 650 (Alaska 1963)).

"evidence that the plaintiff was compensated by a collateral source for all or a portion of the damages caused by the defendant's wrongful act."[9]

The Alaska legislature modified the collateral source rule in medical malpractice cases in 1976 by enacting AS 09.55.548(b), which provides in relevant part:

> Except when the collateral source is a federal program that by law must seek subrogation and except death benefits paid under life insurance, a claimant may only recover damages from the defendant that exceed amounts received by the claimant as compensation for the injuries from collateral sources, whether private, group, or governmental, and whether contributory or noncontributory.

This statute prevents a plaintiff from recovering damages for expenses that have already been paid by a collateral source — typically an insurer — and thereby receiving a windfall. An exception is made for payments from a "federal program that by law must seek subrogation."[10] This exception reflects that a federal program like Medicaid is legally required to seek recovery of its expenditures attributable to a tort, either by pursuing its subrogated claim against the tortfeasor directly or by seeking reimbursement

---

[9]    22 AM. JUR. 2D. *Damages* § 779 (2022).

[10]    "Subrogation" is "the substitution of another person in place of the creditor to whose rights he or she succeeds in relation to the debt, and gives to the substitute all the rights, priorities, remedies, liens, and securities of the person for whom he or she is substituted." 16 GEORGE JAMES COUCH, ET AL., COUCH ON INSURANCE § 222:5 (3d ed. 2021). We have explained that "[w]hen an insurer pays expenses on behalf of an insured it is subrogated to the insured's claim. The insurer effectively receives an assignment of its expenditure by operation of law and contract." *Weston*, 445 P.3d at 1021 n.16 (quoting *Dixon v. Blackwell*, 298 P.3d 185, 193 n.38 (Alaska 2013)). The subrogated claim belongs to the insurer. *Id.* The insurer may allow the insured to include the claim in a suit against a third-party tortfeasor and recoup proceeds directly from the damages award, *id.*, or the insurer "may pursue a direct action against the tortfeasor, discount and settle its claim, or determine that the claim should not be pursued." *Ruggles*, 984 P.2d at 512.

from the claimant's recovery.[11]  Allowing the claimant to recover payments made by a subrogated federal program that is obligated to exercise its recovery rights does not result in a windfall for the plaintiff, because it is the federal program that ultimately recovers this amount.

Yet Medicaid is not the only collateral source that seeks to recover its expenditures on an insured when a tortious third party is responsible.  The contract between a health plan and an insured commonly gives the health plan express rights of subrogation and may also oblige the insured to reimburse the insurer's payments with any damages the insured has recovered from a tortious third party.[12]  That is the case here, where the Lowe's Plan has a contractual right "to recover 100% of the benefits paid . . . without regard to whether the Covered Person is fully compensated by his or her recovery from all sources . . . [and] regardless of how the judgment or settlement is

---

[11]  *See* 42 U.S.C. § 1396a(a)(25)(B) (mandating that states and local agencies seek recovery for Medicaid expenses); AS 47.07.025 (requiring Alaska Medicaid recipients to assign their rights to third-party payment for medical care to the State and permitting the State to garnish a recipient's wages or salary to ensure reimbursement).  The parties assume that Medicare imposes a similar obligation.  Although Medicare clearly possesses a *right* to seek reimbursement, *see* 42 U.S.C. § 1395y(b)(2)(B)(iii), and subrogation, *see* 42 U.S.C. § 1395y(b)(2)(B)(iv), the parties have not pointed to any law that gives Medicare a legal obligation to do so.

[12]  *See* 16 COUCH ET AL., *supra* note 10, § 226:3 ("Traditionally, an insurer who paid its insured's claim then looked to recover the payments from any third party who might have caused the insured's loss.  However, because of various limitations on the concept of 'subrogation,' . . . as well as to avoid the need to undertake the expense of prosecuting its own action against a third party, insurers have in past decades become increasingly concerned with their ability to recover back their payments directly from their own insureds, by means of 'reimbursement.' "); *see also id.* § 222:2 (distinguishing "subrogation" as "attempts by insurers to recover from a third party" from "reimbursement," which refers to "attempts by the insurer to recover from the entity which received the policy proceeds — the insured or a beneficiary — once that entity has, in fact, recovered from the third party who is responsible for causing the loss").

classified." In these cases, the plain language of AS 09.55.548(b) causes the health plan's medical payments to be deducted from the plaintiff's damages award twice: first by the court, applying AS 09.55.548(b), and a second time by the health plan exercising its contractual right of reimbursement. This "double deduction" means that the plaintiff, instead of receiving a windfall, comes up short.

The combination of AS 09.55.548(b) and insurers' contractual rights of subrogation and reimbursement can create harsh results for the injured person to the advantage of the person's insurer, which recovers the cost of providing insurance, and the tortfeasor, who does not have to pay the full cost of the negligence. For example, a severely injured person unable to continue working a strenuous, high-paying job might have incurred $500,000 in medical bills, covered by his insurer, and lost $500,000 in future income. Under AS 09.55.548(b) the person may not recover the $500,000 paid by the insurer. Thus the defendant, who has caused $1 million in damages, is on the hook for half the cost of its negligence. As for the $500,000 the person could recover as compensation for lost income, the insurer may exercise its contractual right of reimbursement and take the entire amount. This person would end up far worse than someone who had no insurance at all, who would be able to recover all damages and, after paying medical debts, could keep the compensation for lost income.[13] Knolmayer takes the position that this result is not unfair; it is the result of a legislative policy choice to reduce damages awards and the insured's choice to accept these terms of health insurance coverage.

---

[13]    McCollum maintains that this harsh result is likely to occur in her case. If AS 09.55.548(b) precludes her from recovering the $349,049.87 the Plan paid for her medical expenses and she is limited to $250,000 in non-economic damages by AS 09.55.549(d), McCollum asserts that she will be left with nothing. We express no opinion on McCollum's allegations or the figures she cites.

To avoid the risk of such a harsh result, McCollum and amici advance several theories of how AS 09.55.548(b) should be interpreted and applied in this case. They argue that because McCollum's health benefit plan is governed by ERISA, it falls within the exception for "federal program[s] that must by law seek subrogation," so AS 09.55.548(b) does not preclude her from recovering damages that were compensated by the Plan. She argues that AS 09.55.548(b) was not intended to result in a "double deduction" for medical malpractice plaintiffs and thus cannot be interpreted to preclude her from recovering damages for which the Plan has a right of reimbursement. If these interpretations of AS 09.55.548(b) are rejected, she argues that the Plan may assign its subrogated claim to her and has done so in this case, allowing her to recover the damages that AS 09.55.548(b) would otherwise preclude her from recovering. Alternatively, McCollum and amici argue that ERISA preempts the application of AS 09.55.548(b) to McCollum's case.

Each of these theories raises questions about just how the legislature intended AS 09.55.548(b) to operate when the collateral source has rights of subrogation and reimbursement — and in particular, who will bear the loss caused by the injury. Lurking underneath these questions is the constitutional question of whether the legislature's approach to allocating the loss is consistent with Alaska Constitution's guarantees of equal protection and due process.

**B. AS 09.55.548(b) Does Not Eliminate Collateral Sources' Subrogated Claims.**

Resolving the parties' arguments requires us to decide how the legislature intended AS 09.55.548(b) to operate and, in particular, how the legislature intended to affect collateral sources' subrogation rights. Put simply, the question is whether the legislature intended to preclude only the injured person from recovering the amount of collateral source payments or to preclude also the collateral sources themselves from

recovering those amounts. Answering this question is the first step to deciding: (1) the scope of the "federal program" exception; (2) whether the Lowe's Plan has a claim it could assign to McCollum for collection; (3) whether ERISA preempts AS 09.55.548(b); and (4) the legislature's ultimate purpose in enacting the statute, which is essential to our constitutional analysis.

Knolmayer contends that the legislature did not intend to abrogate collateral sources' subrogation rights. Rather, he contends the legislature intended merely to preclude claimants from recovering amounts that equitably belong (under subrogation principles)[14] to insurers, so that insurers may pursue these amounts from tortfeasors directly. McCollum and amici appear to agree with this interpretation. Although the parties do not dispute this point, we must independently consider this threshold issue.

Whether the legislature intended to preserve, eliminate, or otherwise modify collateral sources' subrogation rights is an issue of statutory interpretation. We interpret statutes "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[15] "Statutory construction begins with the language of the statute construed in light of the purpose of its enactment."[16] We decide questions of statutory interpretation "on a sliding scale": "the plainer the language of the statute, the more convincing any contrary legislative history must be . . . to overcome the statute's plain meaning."[17] "We give popular or

---

[14] *See Ruggles*, 984 P.2d at 512 (observing that "[w]hen an insurer pays expenses on behalf of an insured it is subrogated to the insured's claim" and that "the subrogated claim belongs to the insurer").

[15] *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999).

[16] *Tesoro Petrol. Corp. v. State*, 42 P.3d 531, 537 (Alaska 2002).

[17] *City of Valdez v. State*, 372 P.3d 240, 248 (Alaska 2016) (first quoting
(continued...)

common words their ordinary meaning, if the words are not otherwise defined in the statute."[18]

The statutory text applies the recovery limitation only to a "claimant."[19] And the text clearly distinguishes between a "claimant" and a "collateral source" from which a claimant receives compensation. Nothing on the face of the statute suggests a limitation on the right of a subrogated insurer to pursue its subrogated claim directly against a tortfeasor.

However, applying the traditional common law rules of subrogation to this statutory text supports a colorable argument that collateral sources too are limited from recovering these amounts. "[A] subrogated insurer stands in [the] shoes of an insured, and has no greater rights than the insured, for one cannot acquire by subrogation what another, whose rights he or she claims, did not have."[20] For that reason, the subrogated insurer "is subject to all the limitations applicable to the original claim of the subrogor [i.e., the insured]."[21] By precluding the claimant from recovering damages for losses compensated by a collateral source, AS 09.55.548(b) arguably precludes the subrogated collateral source from recovering these damages too. And under traditional principles of subrogation, the subrogated insurer would have no right to other categories of damages,

---

[17]      (...continued)
*Marathon Oil Co. v. State*, 254 P.3d 1078, 1082 (Alaska 2011); and then quoting *Peninsula Mktg. Ass'n v. State*, 817 P.2d 917, 922 (Alaska 1991)).

[18]      *Wilson v. State, Dep't of Corr.*, 127 P.3d 826, 829 (Alaska 2006).

[19]      AS 09.55.548(b).

[20]      16 COUCH ET AL., *supra* note 10, § 222.5.

[21]      *Id.*; *see also* 17 COUCH ET AL., *supra* note 10, § 236:8 ("Since the insurer's claim by subrogation is derivative from that of the insured, it is subject to the same statute of limitations as though the cause of action were sued upon by the insured.").

such as pain and suffering or loss of income, that the claimant can still recover.[22] Although the text of AS 09.55.548 does not expressly limit a collateral source's subrogation rights, these subrogation principles raise the possibility that the legislature intended to limit recovery by collateral sources as well as claimants.

The legislative history does not decisively answer this question either. Alaska Statute 09.55.548(b) originated as one of 27 recommendations by a Medical Malpractice Insurance Commission convened by Governor Jay Hammond.[23] In *Reid v. Williams* we described AS 09.55.548(b) as "part of a comprehensive medical malpractice reform package intended to alleviate a perceived crisis in medical malpractice insurance costs."[24]

It seems fairly clear that the Commission intended to limit the recovery of both injured persons and their insurers. The Commission's final draft of the provision that would eventually become AS 09.55.548(b) was similar in many respects to the legislation enacted, but the Commission's draft expressly provided that "[n]otwithstanding other provisions of state law, and except as provided in this subsection, a collateral source does not have a right of subrogation."[25]

---

[22]     *See* 16 COUCH ET AL., *supra* note 10, § 223:94 ("Under the principle that an insurer who pays its insured's claim is only subrogated to the insured's rights against a third party that relate to the same loss compensated by the insurer, it becomes crucial to determine whether a settlement or judgment in an action between the insured and the third party is, in fact, related to the same loss the insurer has compensated.").

[23]     STATE OF ALASKA, REPORT OF THE GOVERNOR'S MEDICAL MALPRACTICE INSURANCE COMMISSION, at iii-vii (1975) (hereinafter COMMISSION REPORT).

[24]     964 P.2d 453, 456 (Alaska 1998).

[25]     House Bill (H.B.) 574, 9th Leg., 2d Sess. (1976) (initial proposal).

The proviso eliminating collateral source subrogation rights is consistent with the Commission's explanation for what became AS 09.55.548(b). The Commission stated:

> [I]t was discovered that frequently a person would be allowed an award predicated upon out-of-pocket losses which, in fact, were wholly or partially compensated from other or collateral sources. The result is potential for double recovery, and the presentation of the additional complications of subrogation and collateral source liens.

> In determining how to approach eliminating the double recovery or subrogation problem, it was determined that overall cost would be reduced if the patient was required to first utilize the first party coverages to which he is entitled, which are much more efficient forms of distribution than allowing the full measure of damages in an expensive third party proceeding, and then deny the patient the right of alleging, in the malpractice action, the items of damage which were compensated by collateral sources.[26]

This discussion indicates that the Commission designed the provision that became AS 09.55.548(b) to lower the size of damages awards by targeting: (1) "double recovery" by claimants whose losses were already compensated, and (2) the "complications of subrogation and collateral source liens."

Finally, the proviso eliminating collateral source subrogation rights also can explain the "federal program" exception.[27] The Commission likely understood that any attempt to abolish the subrogation rights of a "federal program that by law must seek

---

[26]     COMMISSION REPORT, *supra* note 23, at 19.

[27]     *See* AS 09.55.548(b) (providing an exception to the collateral source rule for "federal program[s] that by law must seeks subrogation").

subrogation" would be preempted by federal law.[28] Therefore the Commission allowed claimants to recover damages that had been compensated by a federal program, ensuring that the program's subrogation rights would remain intact. In sum, it seems clear from the Commission's draft legislation and its report that the Commission intended to eliminate the subrogation rights of collateral sources.

What complicates matters is the fact that the legislature then amended the bill based on the Commission's draft legislation to get rid of the sentence expressly eliminating collateral source subrogation rights.[29] It is possible that the legislature viewed that sentence as redundant in light of the common law rules for subrogation: because the claimant could not recover amounts compensated by a collateral source, the principles of equitable subrogation would normally preclude the subrogated collateral source from doing so.[30] Yet it seems unlikely that the legislature eliminated a proviso expressly enacting the legislature's desired policy simply because that policy could be implied by the interaction between other statutory provisions and the common law.

Therefore it seems more plausible that the legislature's amendment was intended to be meaningful. In other words, the legislature may have made a different policy choice than the Commission. Rather than reduce the liability of a physician found to be negligent by eliminating all recovery of collateral source payments, the legislature

---

[28] *See, e.g.*, *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (explaining, in case concerning federal Alien Registration Act, that state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

[29] Committee Substitute for House Bill (C.S.H.B.) 574, (L&C) 9th Leg., 2d Sess. (1976), at 1, 16-17.

[30] *See* 16 COUCH ET AL., *supra* note 10, § 222.5 ("[A] subrogated insurer stands in [the] shoes of an insured, and has no greater rights than the insured . . . .").

may have intended to eliminate the potential for double recoveries by injured persons while allowing their insurers to recover the losses caused by the negligent physician.[31] Unfortunately, there appears to be no explanation of this change in the legislative history.

It is fair to ask why, if the legislature intended to permit collateral sources to pursue subrogated claims directly against the tortfeasor, the legislature retained the "federal program" exception. The legislature may have been concerned that even limiting the insured's recovery would be enough to create preemption problems. By limiting the plaintiff's recovery, AS 09.55.548(b) would in some cases impair a federal program's ability to assert a subrogation lien on damages recovered by the insured; the federal program would therefore have to secure its interest by pursuing a claim directly against the tortfeasor. The legislature may have feared that this degree of interference would result in preemption. Alternatively, the legislature may not have viewed the federal program exception in terms of preemption at all. Instead, the exception may reflect the view that when a federal program is required by law to seek subrogation, there will be no

---

[31]    This would be a reasonable policy choice, even as part of a statutory scheme that seeks to limit malpractice awards overall. Allowing health insurers to recover such costs would theoretically lower the cost of health insurance overall, effectuating a different allocation of the loss than the Commission chose. As the Commission itself observed, "every change in the tort law required the conscious recognition that the burden of loss was being wholly or partially shifted to a new or different class of persons[,] and the Commission struggled hardest on the equities of who should bear the loss." COMMISSION REPORT, *supra* note 23, at 10-11. The legislature could reasonably reach different conclusions on that question than the Commission. The federal district court for the Southern District of New York, interpreting New York's similarly worded statute, pointedly described its understanding of that legislature's policy choice: "Section 4545 prevents double recoveries; it was not intended to deprive insurers of their basic subrogation rights . . . . Certainly, § 4545 was not intended to create a windfall for the tortfeasor, granting it the benefit of the injured party's insurance, for which it did not pay, as a reward, in effect, for committing a tort and injuring another." *In re Sept. 11 Litig.*, 649 F. Supp. 2d 171, 180 (S.D.N.Y. 2009).

chance of double recovery, so the rationale for modifying the collateral source rule does not apply to these claimants. Either way, interpreting AS 09.55.548(b) to preserve collateral source subrogation rights does not create an irrational result, so it is a plausible interpretation of the statute.[32] And because the legislature amended the Commission's draft of the legislation in such a significant way, we cannot confidently ascribe the Commission's intent regarding collateral source subrogation rights to the legislature.

Courts in other jurisdictions have concluded, when interpreting statutes worded similarly to AS 09.55.548(b), that those statutes did not abrogate insurers' rights of subrogation. The Supreme Court of Florida, for example, reached this conclusion with respect to Florida Statute 627.7372(1), which requires the trial court to "instruct the jury to deduct from its verdict the value of all benefits received by the claimant from any collateral source."[33] The court reasoned that the statute "does not bar a cause of action by either the plaintiff insured or his insurer, it merely limits the plaintiff's recovery to monies to which he is equitably entitled."[34] Thus the court saw no reason "why a health insurer should not be entitled to a single recovery of costs caused by the tortfeasor."[35]

---

[32]    *Cf. Martinez v. Cape Fox Corp.*, 113 P.3d 1226, 1230 (Alaska 2005) ("We 'will ignore the plain meaning of an enactment . . . where that meaning leads to absurd results or defeats the usefulness of the enactment.' " (quoting *Davenport v. McGinnis*, 522 P.2d 1140, 1144 n.15 (Alaska 1974))).

[33]    *Blue Cross & Blue Shield of Fla., Inc. v. Matthews*, 498 So. 2d 421, 422 (Fla. 1986).

[34]    *Id.* at 422-23.

[35]    *Id.*

The federal district court for the Southern District of New York reached the same conclusion with respect to New York's statute modifying the collateral source rule.[36] The New York statute, like Alaska's, requires reducing the plaintiff's damages award by the amounts "replaced or indemnified . . . from any collateral source."[37] The court rejected the argument that because a subrogated insurer "stands in the shoes" of its insured and has only the "derivative and limited rights of the insured," the statute abrogates insurers' right of subrogation.[38] The court reasoned that "[t]he principle of subrogation is so embedded in the common law, and would be so radically affected, that a very clear legislative intent to disrupt it is required," yet "[t]he statute contains absolutely no language that effects th[at] disruption."[39] Observing the clarity with which the statute modified the collateral source rule, the court concluded that "the absence of

---

[36]     *In re Sept. 11 Litig.*, 649 F. Supp. 2d at 183-84.

[37]     N.Y. C.P.L.R. § 4545(c) (McKinney 2021) ("In any action brought to recover damages for personal injury, injury to property or wrongful death, where the plaintiff seeks to recover for the cost of medical care, dental care, custodial care or rehabilitation services, loss of earnings or other economic loss, evidence shall be admissible for consideration by the court to establish that any such past or future cost or expense was or will, with reasonable certainty, be replaced or indemnified, in whole or in part, from any collateral source, except for life insurance and those payments as to which there is a statutory right of reimbursement. If the court finds that any such cost or expense was or will, with reasonable certainty, be replaced or indemnified from any such collateral source, it shall reduce the amount of the award by such finding, minus an amount equal to the premiums paid by the plaintiff for such benefits for the two-year period immediately preceding the accrual of such action and minus an amount equal to the projected future cost to the plaintiff of maintaining such benefits.") (amended 2009).

[38]     *In re Sept. 11 Litig.*, 649 F. Supp. 2d at 179-83 (quoting *Winkelman v. Excelsior Ins. Co.*, 650 N.E.2d 841, 844 (N.Y. 1995)).

[39]     *Id.* at 183.

any similar clarity" about eliminating insurers' subrogation rights weighed against interpreting the statute to do so.[40]

As that court observed, subrogation is rooted in the common law,[41] a "creature of equity" with the purpose to "work[] out . . . an equitable adjustment between the parties by securing the ultimate discharge of a debt by the person who in equity and good conscience ought to pay it."[42] "[S]tatutes will not be interpreted as changing the common law unless they effect the change with clarity."[43] We see no clear intent in the text or legislative history to abrogate collateral sources' subrogation rights, and therefore we must conclude the legislature intended to preserve them. Accordingly AS 09.55.548(b) limits the injured party from recovering the amount of collateral source payments received but does not preclude the collateral source itself from seeking these amounts in a direct action against the tortfeasor.

### C. AS 09.55.548(b) Bars A Medical Malpractice Plaintiff From Recovering Damages Paid By A Subrogated Insurer.

The plain language of AS 09.55.548(b) bars medical malpractice plaintiffs from recovering damages compensated by a collateral source such as, in McCollum's case, an insurer: "a claimant may only recover damages from the defendant that exceed amounts received by the claimant as compensation for the injuries from collateral sources, whether private, group, or governmental, and whether contributory or noncontributory." The statute does not contain an exception for collateral sources with a contractual right

---

[40]     *Id.*

[41]     *Id*.

[42]     16 COUCH ET AL., *supra* note 10, § 222:8.

[43]     ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 318 (West 2012).

of subrogation or reimbursement, but only "federal program[s] that by law must seek subrogation and . . . death benefits paid under life insurance."[44] The existence of an exception for death benefits and federal programs that by law must seek subrogation indicates that the legislature did not intend to exclude compensation paid by other kinds of collateral sources from the statute's limitation on recovery.[45]

McCollum argues that the statute's proviso for depleted coverage allows plaintiffs to recover past medical expenses paid by collateral sources. She focuses on the following language in AS 09.55.548(b):

> The court may take into account the value of claimant's rights to coverage exhausted or depleted by payment of these collateral benefits by adding back a reasonable estimate of their probable value, or by earmarking and holding for possible periodic payment under (a) of this section that amount of the award that would otherwise have been deducted, to see if the impairment of claimant's rights actually takes place in the future.

McCollum argues that this language means that the trial court has "the option of replacing collateral sources 'exhausted or depleted' in the post-trial offset hearing if it is established that the 'claimant's rights' were actually 'impaired' by either reimbursement or subrogation."

This interpretation is not persuasive. "[C]overage exhausted or depleted by payment of these collateral benefits" refers to a situation in which the claimant has a limited amount of insurance coverage and the collateral benefits at issue have

---

[44]    AS 09.55.548(b).

[45]    The principle of *expressio unius est exclusio alterius* "establishes the inference that, where certain things are designated in a statute, 'all omissions should be understood as exclusions.' " *Alaska State Comm'n for Hum. Rts. v. Anderson*, 426 P.3d 956, 964 n.34 (Alaska 2018) (quoting *Croft v. Pan Alaska Trucking, Inc.*, 820 P.2d 1064, 1066 (Alaska 1991)).

substantially used up that coverage. The statutory text simply does not refer to subrogation or reimbursement.

McCollum also argues, relying on the legislative history of AS 09.55.548(b), that the legislature had no intent to force injured persons to bear the loss of the injury so as to protect negligent physicians. Therefore, she argues, interpreting AS 09.55.548(b) to preclude a claimant like her from recovering damages compensated by a collateral source with a contractual right to reimbursement is contrary to legislative purpose. As explained further below, we agree with McCollum that the legislature's purpose in enacting AS 09.55.548(b) was to eliminate the potential for a claimant to receive the windfall of double recovery, not to force her to shoulder the loss of injury.[46] But despite this overall purpose, we cannot ignore the plain language of the statute. The legislature clearly was aware that collateral sources could have rights of subrogation and exempted only certain types of collateral source compensation from the statute. McCollum does not point to any legislative history that would suggest the legislature meant something different.[47]

McCollum also relies on decisions from other jurisdictions to argue that AS 09.55.548(b) cannot be interpreted to allow a double deduction. But these decisions interpreting laws that modify the collateral source rule in other states are not a persuasive guide to interpreting AS 09.55.548(b). In *Toomey v. Surgical Services, P.C.* the Iowa Supreme Court ruled that a statute modifying the collateral source rule precluded the

---

[46]     *See* section IV.G. below.

[47]     Although the parties did not address the canon of constitutional avoidance in their briefing, the canon cannot support the interpretation McCollum argues for here, which is directly contrary to the plain meaning of the statutory text and is unsupported by legislative history. *Res. Dev. Council for Alaska, Inc. v. Vote Yes for Alaska's Fair Share*, 494 P.3d 541, 548 (Alaska 2021) (explaining that statute cannot be interpreted unreasonably to avoid a ruling of unconstitutionality).

recovery of a statutory workers' compensation lien that would have resulted in the claimant receiving a double deduction.[48] This conclusion flowed from that court's attempt to harmonize the two statutes.[49] In this case, Lowe's reimbursement right is contractual, not statutory, and McCollum does not point us to another statute that would require us to interpret AS 09.55.548(b) contrary to its plain terms in order to effectuate legislative intent. The Iowa law at issue in *Loftsgard v. Dorrian*, the second case McCollum cites, expressly permitted plaintiffs to present evidence of collateral source indemnification or subrogation rights.[50] Our statute has no comparable language. These decisions therefore do not tell us what the Alaska legislature intended when enacting AS 09.55.548(b).

In re Sept. 11 Litigation[51] does not support McCollum's argument either. In that case a federal district court ruled that New York's similarly worded statute does not bar insurers from directly pursuing their subrogated claims against tortfeasors.[52] But it does not suggest that a *claimant* could recover these amounts and therefore does not suggest that AS 09.55.548(b) should be interpreted that way. Alaska Statute 09.55.548(b) does not permit medical malpractice plaintiffs to recover damages already paid by a subrogated insurer.

---

[48]     558 N.W.2d 166, 167-68, 170 (Iowa 1997).

[49]     *Id*. at 170.

[50]     476 N.W.2d 730, 733 (Iowa App. 1991) (citing Iowa Code § 668.14(2)).

[51]     649 F. Supp. 2d 171 (S.D.N.Y. 2009).

[52]     *Id*. at 183.

**D.     The Lowe's Plan Does Not Fall Within The Statutory Exception For Federal Programs Required By Law To Seek Subrogation.**

The superior court ruled that the Lowe's Plan is a "federal program that by law must seek subrogation" for purposes of AS 09.55.548(b). This ruling allows McCollum to recover damages compensating for the medical expenses covered by the Lowe's Plan, which the Lowe's Plan may then recoup from McCollum pursuant to its contractual right of reimbursement. Knolmayer argues that AS 09.55.548(b)'s federal program exception does not apply to self-funded health benefit plans governed by ERISA, including the Lowe's Plan. On this point we agree with Knolmayer.

**1.     The plain meaning of "federal program that by law must seek subrogation" does not encompass a privately funded, privately administered benefit plan with contractual rights of subrogation and reimbursement.**

According to the plain meaning of the statutory text, the Lowe's Plan is not a federal program. "Federal" refers to the federal government;[53] "program" is defined by Merriam-Webster as "a plan or system under which action may be taken toward a goal."[54] The United States Supreme Court has referred to Medicare and Medicaid — each an amalgamation of federal legislation and regulations that provide for federal funding of individual health benefits through administration by federal agencies — as "federal programs."[55] By contrast, the Lowe's Plan is created and funded by Lowe's Companies, Inc., a private corporation, and is administered by its agent. "[N]o agency of the United States administers ERISA plans; private employers may administer their own ERISA

---

[53]     *See Federal*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[54]     *Program*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1969).

[55]     *Fischer v. United States*, 529 U.S. 667, 671 (2000); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012); 42 U.S.C. §§ 1396a-1396v, §§ 1301-1320b-21 (Medicaid); 42 U.S.C. §§ 1301–1320d-8, 1395–1395lll (Medicare).

plans or may contract for administration of plans from an independent company."[56] A privately funded and operated entity does not fall within the common understanding of the term "federal program."

McCollum offers an array of arguments for why the Lowe's Plan is a "federal program." First, she argues that if the legislature intended to limit the exception to Medicaid, it would have done so explicitly. Although true that the phrase "federal program" is broader than Medicaid alone, that does not mean that the legislature intended it to encompass an entity that was not created, funded, or administered by the federal government.

Second, it is not the case, as McCollum argues, that the Lowe's Plan is a "federal program" simply by virtue of being governed by ERISA. ERISA is a federal law, but that does not mean that every plan or "program" established under its authority is a "federal program" in the straightforward sense of the term: a program of the federal government. Many private actors are comprehensively regulated by the federal government — airlines, auto manufacturers, banks — yet are not themselves commonly thought of as "federal programs." McCollum argues that the Lowe's Plan is a federal program because ERISA gives it "the force of federal law." She points to the fact that ERISA allows insured parties, fiduciaries, and plan administrators to sue to enforce the terms of ERISA and of specific ERISA plans.[57] Yet the existence of a federal cause of

---

[56]    *Botsford v. Blue Cross & Blue Shield of Mont., Inc.*, 314 F.3d 390, 398 (9th Cir. 2002).

[57]    29 U.S.C. § 1132(a)(3) ("A civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."). *See, e.g.*, *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, (continued...)

action to enforce a contract does not make the parties to the contract themselves "federal program[s]." Ultimately, the ordinary meaning of the phrase "federal program" does not encompass a privately funded and administered health benefit plan.

The Lowe's Plan does not satisfy the second element of AS 09.55.548(b)'s exception either: it is not an entity that "by law must seek subrogation." The terms of the Plan state that "[t]he Plan may, at its discretion, . . . commence a proceeding or pursue a claim against any party or coverage for the recovery of all damages to the full extent of the value of any such benefits or conditional payments advanced by the Plan." Further, if the insured party brings her own suit, "[t]he Plan shall be entitled to recover 100% of the benefits paid." McCollum argues that these provisions mean that although the Lowe's Plan has the discretion to seek either subrogation or reimbursement, it is required by law to seek one or the other. Not so: the terms assert the Plan's contractual *right* to recovery, not its obligation to pursue recovery. There is a clear distinction between having the right to do something and being compelled by law to do something

Amicus curiae Premera Blue Cross argues that the assumption that the Lowe's Plan will seek either reimbursement or subrogation is "built into" Lowe's financial reporting to the U.S. Department of Labor,[58] pointing to the plan administrator's duty to make sure that the terms of ERISA plans are enforced.[59] But although prudent

---

[57]    (...continued)
361 (2006) (concluding that plan administrator is a fiduciary under ERISA and able to bring a suit to enforce the terms of a reimbursement provision).

[58]    *See Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 321 (2016) (describing the "extensive . . . reporting, disclosure, and recordkeeping requirements" imposed by ERISA on ERISA plans).

[59]    *See Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2013) (stating that "once a plan is established, the administrator's duty is to see that the
(continued...)

financial management of the Lowe's Plan may call for the Plan administrator to pursue subrogation and reimbursement whenever available, financial dictates are not legal dictates. And even if the terms of the Lowe's Plan could be read to require the administrator to always seek subrogation or reimbursement, these requirements are still only contractual, not legal. " 'Law' connotes a policy imposed by the government, not a privately-negotiated contract."[60] The Lowe's Plan administrator is not required "by law" to seek subrogation.

## 2. The legislative history and apparent purpose of AS 09.55.548(b) do not support interpreting "federal program that by law must seek subrogation" beyond its plain meaning.

McCollum and Premera argue that the phrase "federal program required by law to seek subrogation" should be construed broadly to encompass any entity that by virtue of federal law has subrogation and reimbursement rights, such as health benefit plans governed by ERISA. Premera focuses on the seeming purpose of the "federal program" exception, arguing that the legislature "intended to make an exception for when federal law intervened to require reimbursement out of a tort recovery." Otherwise, Premera reasons, the law would impair "claimants' ability to obtain even a single recovery for loss." McCollum echoes this point, arguing that legislative history indicating an intent to balance claimants' interests against those of insurers and doctors warrants interpreting the "federal program" exception broadly enough to include ERISA plans. Neither McCollum nor Premera points to any legislative history material that directly

---

[59] (...continued) plan is 'maintained pursuant to [that] written instrument' " (alteration in original) (quoting 29 U.S.C. § 1102(a)(1))).

[60] *Empire HealthChoice Assurance, Inc. v. McVeigh*, 396 F.3d 136, 144 (2d Cir. 2005).

explains the intent of the "federal program" exception. Instead, their arguments focus on the broader purposes of the statute.

As explained above, the "federal program" exception in AS 09.55.548(b) may have originally stemmed from the recognition that any attempt to impair the subrogation rights of federal programs would be preempted. And federal programs like Medicaid are not the only entities with federally protected subrogation rights. In 1990 the U.S. Supreme Court ruled in *FMC Corp. v. Holliday* that ERISA preempted a Pennsylvania statute expressly abolishing insurers' rights of subrogation and reimbursement.[61] Accordingly, Premera argues that the "federal program" exception should be interpreted to include payments made by ERISA plans that require reimbursement because the reimbursement requirement is enforceable by federal law. This interpretation, Premera argues, would be consistent with the overall legislative purpose of eliminating double recoveries because an ERISA plan is virtually certain to exercise its reimbursement rights, precluding any windfall to the claimant.

But there is scant support for the notion that the legislature considered ERISA plans and drafted AS 09.55.548(b) around them. The legislature passed AS 09.55.548(b) in 1976.[62] ERISA was enacted only two years prior, ERISA itself does not address rights of subrogation and reimbursement,[63] and the law's broad preemptive

---

[61]     498 U.S. 52, 65 (1990).

[62]     Ch. 102, § 35, SLA 1976.

[63]     *See, e.g.*, *Admin. Comm. for Wal-Mart Stores, Inc. Assocs.' Welfare Plan v. Salazar*, 525 F. Supp. 2d 1103, 1113 (D. Ariz. 2007) ("ERISA does not address reimbursement of medical expenses paid out by a plan."); *Hotel Emps. & Rest. Emps. Int'l Union Welfare Fund v. Gentner*, 815 F. Supp. 1354, 1357 (D. Nev. 1993) ("ERISA itself is silent on the issue of subrogation agreements."), *aff'd*, 50 F.3d 719 (9th Cir. 1995).

scope was not established until years later. It was not until 1990 that the Supreme Court decided *FMC Corp.* So there is little reason to think that the legislature was aware that AS 09.55.548(b) might be preempted when applied to claimants covered by ERISA health benefit plans. That is why the language of AS 09.55.548(b) exempts payments made by a "federal program required by law to seek subrogation" rather than payments by "any entity with federally protected rights of subrogation." Although interpreting the "federal program" exception to include ERISA plans may be consistent with the purpose of that exception, there is no evidence that is what the legislature intended. Absent such evidence, it is not reasonable to interpret "federal program that by law must seek subrogation" to include a *private* entity with a *contractual right* to seek subrogation.[64]

Therefore the Lowe's Plan — a self-funded health benefit plan governed by ERISA, with contractual rights of subrogation and reimbursement — is not a "federal program that by law must seek subrogation." Compensation paid to McCollum by the Lowe's plan is not exempt from AS 09.55.548(b)'s recovery limitation on that ground.

E. **A Claimant Cannot Recover The Value Of Collateral Source Payments That AS 09.55.548(b) Precludes Her From Recovering By Having The Collateral Source Assign Its Subrogated Claim To Her.**

In the superior court, McCollum suggested that the Lowe's Plan could assign its subrogated claim to her, enabling her to recover the damages that AS 09.55.548(b) would otherwise preclude her from recovering. Our order granting the

---

[64] *See Res. Dev. Council for Alaska, Inc. v. Vote Yes for Alaska's Fair Share*, 494 P.3d 541, 548 (Alaska 2021) ("[W]e may not read into a statute that which is not there, even in the interest of avoiding a finding of unconstitutionality, because the extent to which the express language of the provision can be altered and departed from and the extent to which the infirmities can be rectified by the use of implied terms is limited by the constitutionally decreed separation of powers which prohibits this court from enacting legislation or redrafting defective statutes." (quoting *Alaskans for a Common Language v. Kritz*, 170 P.3d 183, 192 (Alaska 2007))).

petition for review asked the parties to discuss whether an insurer may assign a contractually subrogated claim to a plaintiff for collection purposes in a medical malpractice lawsuit.[65] We conclude that even if a subrogated insurer may assign its claim to the insured for collection purposes,[66] the claim is still subject to the limitation imposed by AS 09.55.548(b). The claimant cannot use assignment to circumvent the statute's limitation on her recovery.

To resolve this question, it is helpful to consider precisely what occurs when an insurer is subrogated to the insured's claim. As we explained in *Ruggles ex rel. Estate of Mayer v. Grow*, "[w]hen an insurer pays expenses on behalf of an insured it is subrogated to the insured's claim. The insurer effectively receives an assignment of its expenditure by operation of law and contract."[67] Accordingly, the insured's claim is assigned to the insurer at the precise moment the insurer pays the costs stemming from the incident.[68] From that point on, "the subrogated claim belongs to the insurer."[69] "If the insurer does not object, the insured may include the subrogated claim in its claim against

---

        [65]      *See Knolmayer v. McCollum*, No. S-17792 (Alaska Supreme Court Order, Sept. 29, 2020).

        [66]      Knolmayer argues that the Lowe's Plan did not assign its subrogated claim to McCollum and that any assignment now would be barred by the statute of limitations applicable to malpractice claims. McCollum argues that the Lowe's Plan effectively assigned its subrogated claim to her when it ratified her suit against Knolmayer, so that her timely suit includes the Lowe's Plan's subrogated claim. We assume without deciding that the Plan's ratification of McCollum's suit was an effective assignment of its subrogated claim.

        [67]      984 P.2d 509, 512 (Alaska 1999).

        [68]      *See In re Sept. 11 Litig.*, 649 F. Supp. 2d 171, 179-80 (S.D.N.Y. 2009).

        [69]      *Ruggles*, 984 P.2d at 512.

a third-party tortfeasor."[70] In other words, a partially subrogated insurer may ratify a claim brought by its insured.[71] By enacting AS 09.55.548(b) the legislature made ratification fruitless because the statute precludes the insured from recovering the amounts to which the insurer is entitled.

McCollum argues, in effect, that a claimant can evade the statutory bar by having the subrogated insurer *assign* the claim to the claimant instead of *ratify* the claimant's pursuit of the claim. The distinction between "assign" and "ratify" in this context is semantic: in both cases, the insurer permits the injured person to pursue the insurer's claim in exchange for the right to recoup the proceeds of the claim from the insured. It is quite unlikely that the legislature, which clearly understood the concepts of subrogation and ratification when it adopted AS 09.55.548(b),[72] intended to allow claimants to evade the bar on recovery through the use of this semantic distinction. Therefore a claimant cannot recover damages compensated by a collateral source by having the collateral source assign its subrogated claim to the claimant.

### F. ERISA Does Not Preempt AS 09.55.548(b)'s Bar On Claimants' Recovery Of Collateral Source Payments.

Although our order granting the petition for review did not ask the parties to address preemption, the parties have devoted a substantial portion of their briefing to this question. McCollum and Premera argue that because AS 09.55.548(b) limits a

---

[70] *Id.*

[71] *See Mun. of Anchorage v. Baugh Constr. & Eng'g Co.*, 722 P.2d 919, 925 (Alaska 1986) (describing effect of partially subrogated insurer's ratification of insured's suit against party causing injury).

[72] COMMISSION REPORT, *supra* note 23, at 19 (describing problem of subrogation); *see also Young v. Embley*, 143 P.3d 936, 945 (Alaska 2006) ("We presume the legislature is aware of the common law when enacting statutes.").

claimant's recovery, the claimant's insurer may not be able to fully recover its expenditures by relying on its contractual reimbursement rights. In these cases the insurer would have to pursue its subrogated claim directly against the tortfeasor in order to fully recover its interest. Because the statute has the potential to impair insurers' contractual reimbursement rights in this way, McCollum argues, ERISA preempts the statute's application when the collateral source is an employer's self-funded health benefit plan like the Lowe's Plan. Under this theory McCollum must be allowed to recover from Knolmayer the compensation she has received from the Lowe's Plan, which the Lowe's Plan will in turn recover from her through its contractual right of reimbursement.

"ERISA pre-empts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' covered by ERISA."[73] The U.S. Supreme Court has explained that ERISA's pre-emption clause is "conspicuous for its breadth."[74]

The test for ERISA preemption has three steps. First, ERISA preempts "every state law that 'relate[s] to' an employee benefit plan governed by ERISA," so a court must determine whether a given law "relates to" an ERISA plan.[75] If the law does not "relate to" a plan governed by ERISA, it is not preempted. Second, under the "saving clause," state laws that would otherwise be struck down are "saved" from ERISA preemption if they "regulat[e] insurance."[76] Third, under the "deemer clause," an ERISA plan "shall not be deemed an insurance company, an insurer, or engaged in the business

---

[73]     *Rutledge v. Pharm. Care Mgmt. Ass'n,* 141 S. Ct. 474, 479 (2020) (quoting 29 U.S.C. § 1144(a)).

[74]     *FMC Corp. v Holliday*, 498 U.S. 52, 58 (1990).

[75]     *Id.* (alteration in original) (quoting *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985)).

[76]     *Id.* (alteration in original).

of insurance for purposes of state laws 'purporting to regulate' insurance companies or insurance contracts."[77]  Thus, even a state law that is "saved" as a law regulating insurance is nonetheless preempted as applied to an ERISA plan.  ERISA plans are "bound by state insurance regulations insofar as they apply to the plan's insurer," but may not be directly regulated by such regulations.[78]

In the first step of the preemption analysis we ask whether AS 09.55.548(b) relates to an ERISA plan.[79]  The U.S. Supreme Court has held that a law relates to an ERISA plan "if it has 'a connection with or reference to such a plan.' "[80]

### 1. AS 09.55.548(b) does not "refer to" ERISA.

In *FMC Corp. v. Holliday* the U.S. Supreme Court ruled that ERISA preempted Pennsylvania's antisubrogation law.[81]  The statute at issue maintained that there would be no right to subrogation or reimbursement "with respect to . . . benefits . . . paid or payable" by "[a]ny program, group contract or other arrangement for payment of benefits," which "includ[e], *but [are] not limited to*, benefits payable by a hospital plan corporation or a professional health service corporation."[82]  This language — into which an ERISA plan, as a "program . . . for payment of benefits," falls — led the Court to

---

[77]     *Id.*

[78]     *Id.* at 61.

[79]     The superior court erred by applying this test to determine whether McCollum's *claim* related to ERISA, rather than whether AS 09.55.548(b) does so.  The preemption analysis properly focuses on the state law, not a plaintiff's claim.

[80]     *FMC Corp.*, 498 U.S. at 58 (quoting *Shaw v. Delta Air Lines*, 463 U.S. 85, 97 (1983)).

[81]     *Id.* at 65.

[82]     *Id.* at 59 (emphasis and alterations in original) (quoting 75 PA. CONS. STAT. §§ 1719, 1720 (1987)).

conclude that the law "ha[d] a 'reference' to benefit plans governed by ERISA."[83] The *FMC Corp.* decision thus suggested that any statute that applies to ERISA plans satisfies the first step of the preemption analysis.

But the Court has retreated somewhat from such a sweeping rule. Its most recent decisions on ERISA preemption articulate a different test: "[a] law refers to ERISA if it 'acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation.' "[84] The Court's recent decision in *Rutledge v. Pharmaceutical Care Management Association* provides a useful illustration.[85] The Arkansas law at issue in *Rutledge* effectively required pharmacy benefit managers to reimburse pharmacies at a price equal to or higher than that which the pharmacies paid to buy the drug from wholesalers.[86] Rejecting the pharmacies' argument that the law referred to ERISA plans simply because it applied to them, the Court held that this law did not refer to ERISA "because it applie[d] to [pharmacy benefit managers] whether or not they manage an ERISA plan."[87] Nor was ERISA "essential to the law's

---

[83] *Id*.

[84] *Rutledge v. Pharm. Care Mgmt. Ass'n.*, 141 S. Ct. 474, 481 (2020) (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319-20 (2016)).

[85] *Id.*

[86] *Id*. at 479. Pharmacy benefit managers (PBMs), the Court explained, are "intermediaries between prescription-drug plans and the pharmacies that beneficiaries use. When a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription, the pharmacy checks with a PBM to determine that person's coverage and copayment information. After the beneficiary leaves with his or her prescription, the PBM reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment. The prescription-drug plan, in turn, reimburses the PBM." *Id*. at 478.

[87] *Id*. at 481.

operation" for largely the same reason: the law regulated pharmacy benefit managers regardless of whether the plans they served fell under ERISA.[88]

Accordingly the Court has ruled that laws of general applicability — those that do not exclusively affect ERISA plans — do not refer to ERISA plans for preemption purposes. In *New York State Conference of Blue Cross and Blue Shield Plans v. Travelers Insurance Co.*, the Court considered a law imposing a surcharge on hospital billing rates for patients covered by insurers others than Blue Cross/Blue Shield, presuming such surcharges would be passed on to insurance buyers, including ERISA plans.[89] The Court rejected the argument that the law referred to an ERISA plan because "[t]he surcharges are imposed upon patients and [health maintenance organizations (HMOs)], regardless of whether the commercial coverage or membership, respectively, is ultimately secured by an ERISA plan."[90] And in *California Division of Labor Standards Enforcement v. Dillingham Construction, N.A.*, the Court weighed a law permitting public works contractors to pay lower wages to apprentices in approved apprenticeship programs.[91] "Because it seems that approved apprenticeship programs need not necessarily be ERISA plans," the Court found the law did not "refer to" ERISA plans.[92]

Alaska Statute 09.55.548(b) does not act immediately and exclusively upon ERISA plans. The law does not apply "exclusively" to ERISA plans but to all collateral

---

[88]     *Id*. (quoting *Gobeille*, 577 U.S. at 319-320).

[89]     514 U.S. 645, 650, 659 (1995).

[90]     *Id*. at 656.

[91]     519 U.S. 316, 319-20 (1997).

[92]     *Id.* at 325.

sources other than federal programs that by law must seek subrogation and death benefits under life insurance. Nor is ERISA essential to the law's operation: if ERISA were abolished AS 09.55.548(b) would function without a problem. Instead the statute is like the pharmacy reimbursement law in *Rutledge*, the prevailing wage statute in *Dillingham*, or the billing surcharge law in *Travelers*, all of which were "indifferent" to ERISA.[93] AS 09.55.548(b) does not relate to ERISA under this test.

### 2. AS 09.55.548(b) does not have an impermissible connection with ERISA.

The U.S. Supreme Court's case law on what constitutes an impermissible connection with ERISA plans is more complicated but follows a similar trajectory. In *FMC Corp.* the Court held a Pennsylvania law abolishing collateral source subrogation rights had an impermissible connection with ERISA plans because the statute would require plans "to design their programs in an environment of differing state regulations."[94] This, in turn, "would complicate the administration of nationwide plans, producing inefficiencies that employers might offset with decreased benefits."[95] The Court concluded that such inefficiencies were sufficient to establish a connection to ERISA,

---

[93] *Id.* at 325-26, 328 (holding that California's prevailing wage statute made no reference to ERISA plans because it "functions irrespective of . . . the existence of an ERISA plan" and "is indifferent to the funding, and attendant ERISA coverage, of apprenticeship programs" (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990)); *Travelers*, 514 U.S. at 656 (holding that New York law applying surcharges on insurance plans did not refer to ERISA plans because they were imposed on plans "regardless of whether the commercial coverage or membership . . . is ultimately secured by an ERISA plan"); *Rutledge*, 141 S. Ct. at 481.

[94] 498 U.S. 52, 60 (1990).

[95] *Id.*

reflecting its belief that ERISA's "pre-emptive scope was as broad as its language."[96] A state law, the Court explained, has a connection with ERISA benefit plans if it "risk[s] subjecting plan administrators to conflicting state regulations."[97]

The Court clarified the scope of this holding in a series of decisions culminating in *Rutledge*, in which it explained what it means for a law to have an "impermissible connection" with an ERISA plan.[98] The Court noted that ERISA is "primarily concerned with pre-empting laws that require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits . . . or by binding plan administrators to specific rules for determining beneficiary status."[99] ERISA also preempts a state law "if 'acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a certain scheme of substantive coverage.' "[100] In analyzing preemption, "th[e] Court asks whether a state law 'governs a central matter of plan administration or interferes with nationally uniform plan administration.' "[101] If so, the law is preempted.[102]

"Crucially, not every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA

---

[96]     *Id.* at 59-60 (quoting *Shaw v. Delta Air Lines*, 563 U.S. 85, 98 (1983)).

[97]     *Id.* at 59.

[98]     141 S. Ct. at 480-81.

[99]     *Id.* at 480 (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016)).

[100]     *Id.* (quoting *Gobeille*, 577 U.S. at 320).

[101]     *Id.* (quoting *Gobeille*, 577 U.S. at 320).

[102]     *Id.*

plan," especially "if a law merely affects costs."[103] Therefore the Court ruled in *Travelers* that ERISA did not preempt the surcharge on hospital billing rates for non-Blue Cross/Blue Shield insurers, which the Court presumed would be passed on to insurance buyers, among them ERISA plans.[104] Although the financial effects of the law would incentivize ERISA plans to choose Blue Cross/Blue Shield over alternatives, the Court held such an indirect economic influence did not create an impermissible connection because it did not "bind plan administrators to any particular choice."[105] In other words, "ERISA does not pre-empt state rate regulations that merely increase costs or alter incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage."[106] Accordingly in *Rutledge* the Court determined that a law regulating pharmacy benefit managers by requiring them to reimburse pharmacies at a minimum rate "[was] merely a form of cost regulation."[107] Although such costs may be passed on to ERISA plans, the Court explained that "cost uniformity was almost certainly not an object of pre-emption."[108] "Nor is the effect of [the law] so acute that it will effectively dictate plan choices."[109] The Court concluded that the pharmacy

---

[103]     *Id*.

[104]     *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 659 (1995).

[105]     *Id.*

[106]     *Rutledge*, 141 S. Ct. at 480.

[107]     *Id.* at 481.

[108]     *Id*. (quoting *Travelers*, 514 U.S. at 662).

[109]     *Id*.

reimbursement law was a simple cost regulation and did not have an impermissible connection with an ERISA plan.[110]

Because AS 09.55.548(b) does not abrogate collateral sources' subrogation rights, it does not have the kind of "impermissible connection" with ERISA described by the U.S. Supreme Court. The Court's preemption analysis is concerned with whether a state law affects ERISA plans by "dictat[ing] the choices"[111] of the plan or "forcing plans to adopt [a] particular scheme of substantive coverage."[112] Reducing plaintiffs' recovery by the amount of collateral source payments does potentially increase costs for ERISA plans. If AS 09.55.548(b) results in a claimant recovering an amount of damages less than the value of collateral source payments, then the ERISA plan will be unable to completely recoup its costs through reimbursement. For example, if a plaintiff receives $100,000 from her plan but is limited to collecting $80,000 from a tortfeasor by AS 09.55.548(b), the ERISA plan will be short $20,000 following reimbursement.

But ERISA plans may still recover the full amount expended by pursuing the subrogated claim directly against the tortfeasor. Though there will be legal costs associated with seeking recovery through subrogation, "ERISA does not pre-empt state rate regulations that merely increase costs or alter incentives for ERISA plans."[113] Just as the surcharge on non-Blue Cross/Blue Shield insurers passed on costs to ERISA plans

---

[110] *Id.*

[111] *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 334 (1997).

[112] *Rutledge*, 141 S. Ct. at 480.

[113] *Id.*

but did not "bind plan administrators to any particular choice,"[114] AS 09.55.548(b) may increase the cost to ERISA plans of obtaining full recovery but does not prevent them from doing so. For that reason AS 09.55.548(b) is quite unlike the Pennsylvania anti-subrogation law struck down in *FMC Corp. v. Holliday*.[115] There, the law *did* dictate choices: ERISA plans were barred from seeking recovery of expenses via subrogation or reimbursement.[116] By contrast, as explained above the Alaska Legislature rejected the Medical Malpractice Commission's proposal to abolish collateral sources' subrogation rights.[117] Therefore AS 09.55.548(b) "does not bind plan administrators to any particular choice."[118] The economic effects of the statute — the costs associated with collateral sources recovering costs via subrogation instead of reimbursement in some instances — are not so severe as to effectively "force an ERISA plan to adopt a certain scheme of substantive coverage."[119]

For that reason we conclude that AS 09.55.548(b) does not have an impermissible connection with ERISA plans. And because the statute neither refers to nor has an impermissible connection with ERISA plans, it is not preempted.

---

[114] *Id.* (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 659 (1995)).

[115] 498 U.S. 52, 59-60 (1990).

[116] *Id.* at 60.

[117] *See* section IV.B. above.

[118] *Travelers*, 514 U.S. at 659.

[119] *Rutledge*, 141 S. Ct. at 480 (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016)).

**G.      AS 09.55.548(b) Violates The Alaska Constitution's Equal Protection Guarantee.**

In our order granting Knolmayer's petition for review, we asked the parties to address whether AS 09.55.548(b) violates the equal protection guarantee of the Alaska Constitution when applied to a plaintiff whose insurer has a contractual right to reimbursement from the plaintiff's recovery.  Having considered the parties' and amici curiae's briefing on this point, we conclude that AS 09.55.548(b) is unconstitutional as applied to such claimants.[120]

Article 1, section 1 of the Alaska Constitution provides "that all persons are equal and entitled to equal rights, opportunities, and protections under the law."  "We interpret the equal protection clause 'to be "a command to state and local governments to treat those who are similarly situated alike." ' "[121]  "The guarantee of equal protection under the Alaska Constitution is more robust than that under the United States Constitution and so 'affords greater protection to individual rights than' its federal counterpart."[122]

---

[120]      "An as-applied [constitutional] challenge requires evaluation of the facts of the particular case in which the challenge arises," while a facial challenge means "that there is no set of circumstances under which the statute can be applied consistent with the requirements of the constitution." *Ass'n of Vill. Council Presidents Reg'l Hous. Auth. v. Mael*, 507 P.3d 963, 982 (Alaska 2022) (quoting *Dapo v. State, Off. of Child's Servs.*, 454 P.3d 171, 180 (Alaska 2019); *State v. ACLU of Alaska*, 204 P.3d 364, 372 (Alaska 2009)).

[121]      *Watson v. State*, 487 P.3d 568, 570 (Alaska 2021) (quoting *Pub. Emps.' Ret. Sys. v. Gallant*, 153 P.3d 346, 349 (Alaska 2007)).

[122]      *Id.* (quoting *Alaska Civ. Liberties Union v. State*, 122 P.3d 781, 787 (Alaska 2005)).

"Under our equal protection analysis, 'we first decide which classes must be compared.' "[123] "As a matter of nomenclature we refer to that portion of a [statute] that treats two groups differently as a 'classification.' "[124] "Once we have identified the relevant classes, we determine whether the statute discriminates between them by treating similarly situated classes differently."[125]

After identifying the classes to be compared, we then apply "a flexible three-step sliding-scale."[126] First, we determine "what weight should be afforded the constitutional interest impaired by the challenged enactment."[127] Second, we examine "the purposes served by a challenged statute."[128] Third, we evaluate "the state's interest in the particular means employed to further its goals."[129] How closely the statute is scrutinized at these second and third steps depends on the standard chosen by the court at the first step.[130]

---

[123]     *Id.* (quoting *Planned Parenthood of the Great Nw. v. State*, 375 P.3d 1122, 1135 (Alaska 2016)).

[124]     *Id.* (alteration in original) (quoting *Planned Parenthood of the Great Nw.*, 375 P.3d at 1135).

[125]     *Id.*

[126]     *Planned Parenthood of the Great Nw.*, 375 P.3d at 1137.

[127]     *Id.* (quoting *Alaska Pac. Assurance Co. v. Brown*, 687 P.2d 264, 269 (Alaska 1984)).

[128]     *Id.* (quoting *Alaska Pac. Assurance Co.*, 687 P.2d at 269).

[129]     *Id.* (quoting *Alaska Pac. Assurance Co.*, 687 P.2d at 269).

[130]     *See id.*

## 1. The statute classifies claimants based on the existence and origin of collateral source compensation.

A legislative classification "is defined by the terms of the statute at issue."[131] Alaska Statute 09.55.548(b) creates two classifications. First, it distinguishes between those claimants who receive compensation from collateral sources and those who do not. Claimants who receive compensation for their injuries from collateral sources are subject to a limitation on their recovery: they cannot recover amounts from the tortfeasor that correspond to the amounts of compensation received from the collateral source. By contrast, claimants who do not receive collateral source compensation are not so limited in their recovery. Second, the statute distinguishes between those whose collateral source compensation comes from a "federal program that by law must seek subrogation" and those whose compensation comes from all other kinds of collateral sources.[132] The former group are exempt from the recovery limitations that otherwise apply to those who receive compensation from collateral sources.[133]

---

[131] *Watson v. State*, 487 P.3d 568, 571 (Alaska 2021).

[132] The statute also distinguishes those who receive life insurance payments, but that distinction is not relevant to our constitutional analysis. *See* AS 09.55.548(b) ("Except when the collateral source is a federal program that by law must seek subrogation and except death benefits paid under life insurance, a claimant may only recover damages from the defendant that exceed amounts received by the claimant as compensation for the injuries from collateral sources . . . .").

[133] Knolmayer argues that the classification "between medical malpractice plaintiffs with certain collateral sources and those without is a classification that is the result of a series of choices made by Ms. McCollum," including the decision to accept health coverage from her husband's employer's self-funded health benefit plan, along with the accompanying subrogation and reimbursement terms of the plan. But the classification between those who receive collateral source compensation from a "federal" program, those who receive collateral source compensation from other sources, and those

(continued...)

-45- **7631**

## 2. These classifications are subject to minimum scrutiny.

The interests affected by AS 09.55.548(b) are financial, so the lowest level of scrutiny applies to the statute's classifications. We explained in *Reid v. Williams* — also concerning whether AS 09.55.548(b) violated the equal protection clause — that "[a] medical malpractice plaintiff's right to damages is an economic interest, which traditionally receives only minimal protection under our equal protection analysis."[134] This is because the alleged discrimination did not involve a protected class and thus merited only "minimal judicial protection."[135] The recovery limits set by AS 09.55.548(b) "impose[] only economic burdens, and allocate[] these burdens using criteria that are not

---

[133]     (...continued)
who receive no collateral source compensation at all is expressly drawn by the text of AS 09.55.548(b). And the suggestion that these classifications are immaterial because a person is free to choose a particular health insurance plan and the precise terms and conditions that go with it is not persuasive. Almost half of Alaskans, like McCollum, receive health insurance through their employer. *Health Insurance Coverage of the Total Population (2019)*, KAISER FAMILY FOUNDATION, https://www.kff.org/other/state-indicator/total-population/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Oct. 21, 2022). Many others are insured by Medicare or Medicaid. *Id.* These individuals generally are not choosing among health care plans based on their preferences; rather, the health care coverage they receive is based on where they are employed or what federal eligibility guidelines they meet. Their power to select among plans or negotiate plan provisions is negligible at best. In reality, most people have little freedom to choose the terms and conditions of their health insurance coverage, and the classifications drawn by AS 09.55.548(b) are significant in light of that reality.

[134]     964 P.2d 453, 458 (Alaska 1998); *see also Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1053 (Alaska 2002) ("[R]estrictions on the types or amounts of damages that a plaintiff can pursue in court only infringe upon economic interests. Such economic interests do not count as 'important' interests under our equal protection analysis.").

[135]     *Reid*, 964 P.2d at 458

presumptively suspect," so our scrutiny as to the legislature's aims is "minimal."[136] Thus, we must ask whether the classifications created by AS 09.55.548(b) bear "a 'fair and substantial relation' to attaining 'legitimate' government objectives."[137]

### 3. The legislative purpose of AS 09.55.548(b) is to reduce the size of malpractice awards by eliminating double recoveries.

The next step of the analysis is to determine the purpose of AS 09.55.548(b). We have once before addressed this issue in *Reid*.[138] In that case an injured claimant argued that AS 09.55.548(b)'s recovery limitation violated equal protection because it unreasonably distinguished between negligent doctors, who were protected by the statute's recovery limitations, and other tort defendants, who are subject to a different statute modifying the collateral source rule.[139] Applying the "fair and substantial" relationship test, we upheld the statute.[140] We reasoned that AS 09.55.548(b) was part of a broad package of medical malpractice reforms designed to "control medical malpractice insurance costs and increase the availability of health care."[141] And we concluded that the statute bore a fair and substantial relationship to that goal.[142] The special problem of medical malpractice insurance and the availability of health care justified the legislature's

---

[136]    *C.J. v. State, Dep't of Corr.*, 151 P.3d 373, 380 (Alaska 2006).

[137]    *Reid*, 964 P.2d at 458 (quoting *Pan-Alaska Constr., Inc. v. State*, 892 P.2d 159, 162 (Alaska 1995)).

[138]    *Id.* at 456-60.

[139]    *Id.* at 458-60; *see also* AS 09.17.070(a).

[140]    *Reid*, 964 P.2d at 458-60.

[141]    *Id.* at 459.

[142]    *Id.*

decision to pare down the collateral source rule more aggressively in medical malpractice cases than in other tort cases.

Our conclusion in *Reid* that AS 09.55.548(b) had the purpose of reducing damages awards against medical providers is not the end of the story in this case. Given the differential treatment we focused on in *Reid* — between physicians and other tortfeasors — it was sufficient to consider the statute's purpose at a high level of generality. In other words, all we had to consider was why the legislature treated medical malpractice suits differently from other tort lawsuits. To consider the justification for how AS 09.55.548(b) treats different classes of medical malpractice claimants based on the existence and nature of collateral source compensation, we must dig deeper by closely examining the statutory scheme and legislative history.[143]

As explained above, the overall goal was to adjust the legal framework for medical malpractice claims to control the cost of malpractice insurance.[144] Yet it is clear that neither the Commission nor the legislature sought to reduce damages awards at all costs. For instance, the Commission rejected an absolute limit on the discovery period

---

[143]     *See Com. Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1264 n.39 (Alaska 1980) (disavowing notion that "the judiciary is required to hypothesize or invent purposes" for equal protection review because "[c]lose examination of the statutory scheme will usually yield several concrete legislative purposes having a substantial basis in reality, even if these purposes are not specifically identified in a statutory purpose clause").

[144]     *See* COMMISSION REPORT, *supra* note 23, at 15 (proposing changes to medical malpractice law "because Alaska would soon be faced with the same frequency and severity of problems which [were] genuinely threatening the system in many of the other states" and because "many carriers ha[d] designated certain tort law reforms as a necessary precondition to underwriting malpractice in a state").

in malpractice cases in part to avoid overly burdening the plaintiff.[145]  It declined to raise the burden of proof in medical malpractice cases because doing so "would make it more difficult for the legitimate cases to be adjudicated."[146]  And it professed it sought to do "no violence to the legitimate rights of persons injured as a result of negligent conduct."[147]

With respect to the provision that became AS 09.55.548(b), the Commission explained that it was "unwilling to place arbitrary roadblocks that would preclude the legitimate claimant from having recourse to counsel and the courts for redress," but had "discovered that frequently a person would be allowed an award predicated upon out-of-pocket losses which, in fact, were wholly or partially compensated from other or collateral sources."[148]  The clear goal was to reduce damages awards by "eliminating the double recovery or subrogation problem."[149]

Knolmayer argues that the legislature had a different, more aggressive purpose:  to reduce malpractice awards in all cases regardless of the claimant's potential for a double recovery.  Echoing the Commission's observation that "every change in the tort law required the conscious recognition that the burden of loss was being wholly or partially shifted to a new or different class of persons,"[150] Knolmayer argues that the legislature sought to reduce the size of damages awards by forcing the injured person to bear the loss.  He maintains that the legislature's decision to preserve collateral source

---

[145]    *Id.* at 17-18.

[146]    *Id.* at 24.

[147]    *Id.* at 52.

[148]    *Id.* at 19.

[149]    *Id.*

[150]    *Id.* at 10-11.

subrogation rights — a different policy choice than the Commission had endorsed — is evidence of a legislative purpose to allow collateral sources to be made whole at the expense of their insured.

Yet it is hard to view the legislature's decision to preserve collateral source subrogation rights as a policy of protecting negligent physicians at the expense of the injured person. By preserving collateral source subrogation rights the legislature *increased* the likelihood that the negligent physician would be liable for the full measure of harm caused. Under the Commission's draft legislation, neither the injured claimant nor the collateral source could recover compensated medical expenses from the tortfeasor.[151] Under the version of AS 09.55.548(b) ultimately enacted, a subrogated collateral source may collect these amounts directly from the tortfeasor. This shift in the statute's operation — restoring the physician's liability for the full amount of harm caused — undercuts Knolmayer's argument that AS 09.55.548(b) was intended to shift the burden of loss to the *claimant*. Instead it confirms the view that the legislative purpose was to prevent claimants from receiving awards "predicated upon out-of-pocket losses which, in fact, were wholly or partially compensated" — i.e. the "potential for double recovery" — while preserving insurers' right to recover these amounts from the tortfeasor.[152]

Another change the legislature made to the Commission's draft legislation supports the conclusion that the legislature's purpose for AS 09.55.548(b) was solely to eliminate double recoveries rather than shift the burden of loss to the injured person. The legislature added a provision to protect against depletion of the claimant's insurance coverage by being forced to rely on the collateral source payments:

---

[151]    H.B. 574, 9th Leg. 2d Sess. (1976).

[152]    COMMISSION REPORT, *supra* note 23, at 19.

> The court may take into account the value of claimant's rights to coverage exhausted or depleted by payment of these collateral benefits by adding back a reasonable estimate of their probable value, or by earmarking and holding for possible periodic payment under (a) of this section that amount of the award that would otherwise have been deducted, to see if the impairment of claimant's rights actually takes place in the future.[153]

With this provision, the legislature intended to avoid a situation in which the claimant would be adversely affected by being forced to rely on compensation from her insurance provider rather than from the tortfeasor. This protection is hard to square with Knolmayer's argument that the purpose of AS 09.55.548(b) was to force injured claimants to bear the loss.

Knolmayer's argument also relies on a contrast between AS 09.55.548(b) and AS 09.17.070, which modified the collateral source rule for other kinds of tort claims. The latter statute exempts payments from "collateral sources that do not have a right of subrogation by law or contract" from that statute's recovery limitations.[154] Knolmayer suggests that the express mention of subrogation in AS 09.17.070 indicates that the legislature consciously chose in AS 09.55.548(b) to limit claimants' damages irrespective of the effect of subrogation on their recovery. But AS 09.17.070 was enacted ten years

---

[153]    AS 09.55.548(b).

[154]    AS 09.17.070(a) provides:

> After the fact finder has rendered an award to a claimant, and after the court has awarded costs and attorney fees, a defendant may introduce evidence of amounts received or to be received by the claimant as compensation for the same injury from collateral sources that do not have a right of subrogation by law or contract.

after AS 09.55.548(b) and is therefore not a strong guide as to the legislative purpose behind the earlier statute.[155] Knolmayer argues further that the legislature amended AS 09.55.548 in 1992, after the enactment of AS 09.17.070. But the 1992 amendment to AS 09.55.548 was merely a corrective amendment to subsection (a) and had nothing to do with the collateral source provisions of subsection (b).[156] Thus neither AS 09.17.070 nor the 1992 amendments to AS 09.55.548(a) shed light on the legislative purpose behind AS 09.55.548(b).

Given the stated purpose, structure, and drafting history of what became AS 09.55.548(b), there is no reason to think that the legislature's purpose was to reduce malpractice damages awards by shifting the burden of loss onto the injured person. Instead we conclude that the purpose behind AS 09.55.548(b) was to reduce malpractice damages awards by eliminating double recoveries.

### 4. The statutory classifications lack a fair and substantial relationship to the legitimate purpose of eliminating double recoveries.

We must therefore consider whether the distinctions drawn by AS 09.55.548(b) — limiting the recovery of those who receive compensation from a non-federal collateral source — have a fair and substantial relationship to the purpose of preventing double recoveries. Under this test, "less important governmental objectives will suffice and a greater degree of over/or underinclusiveness in the means-to-ends fit

---

[155] *Compare* Ch. 139, § 1, SLA 1986, *with* Ch. 30, § 7, SLA 1992; *see also Girdwood Mining Co. v. Comsult LLC*, 329 P.3d 194, 199 n.21 (Alaska 2014) ("Post-enactment legislative history is disfavored because 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.' " (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980))).

[156] *See* Ch. 30, § 7, SLA 1992.

will be tolerated."[157] "As a minimum, we require that the legislation be based on a legitimate public purpose and that the classification 'be reasonable, not arbitrary, and . . . rest upon some ground of difference having a fair and substantial relation to the object of the legislation.' "[158] In other words, "a substantial relationship between means and ends is constitutionally adequate."[159]

The equal protection decisions that Knolmayer cites in defense of AS 09.55.548(b) are not controlling here. In *Reid* we concluded that paring down the collateral source rule more for medical malpractice claims than for other tort claims was justified by the special problem of the malpractice insurance crisis.[160] But we did not examine the precise mechanisms by which AS 09.55.548(b) modified the collateral source rule for these claims, nor was the issue of subrogation squarely addressed. In *C.J. v. State, Department of Corrections*[161] and *L.D.G., Inc. v. Brown*,[162] we upheld statutory caps on non-economic damages, deeming them sufficiently related to the legislative purpose of lowering liability insurance premiums.[163] But the blunt legislative purpose behind the damages caps — reducing damages awards by limiting compensation for a type of loss viewed as subjective and difficult to measure regardless of whether particular

---

[157]     *State v. Ostrovsky*, 667 P.2d 1184, 1193 (Alaska 1983).

[158]     *Id.* (quoting *Isakson v. Rickey*, 550 P.2d 359, 362 (Alaska 1976)).

[159]     *Harris v. Millenium Hotel*, 330 P.3d 330, 336 (Alaska 2014) (quoting *State v. Schmidt*, 323 P.3d 647, 662-63 (Alaska 2014)).

[160]     *Reid v. Williams*, 964 P.2d 453, 459 (Alaska 1998).

[161]     151 P.3d 373 (Alaska 2006).

[162]     211 P.3d 1110 (Alaska 2009).

[163]     *C.J.*, 151 P.3d at 381; *L.D.G., Inc.*, 211 P.3d 1110.

claimants are fully compensated[164] — is not the purpose behind AS 09.55.548(b). Rather AS 09.55.548(b) was intended to reduce damages awards by eliminating double recoveries. Because of this statute's distinct purpose, we must independently assess its means-to-ends fit.

Preventing medical malpractice claimants from receiving double recoveries in order to limit the size of malpractice damages awards is a legitimate public purpose. But the distinctions drawn by AS 09.55.548(b) do not bear a fair and substantial relationship to this goal. The statutory classifications are premised on the assumption that claimants who receive compensation for their injuries from non-federal collateral sources would receive a double recovery if permitted to recover damages for those injuries from the tortfeasor. But this assumption does not reflect reality.[165] A claimant like McCollum is obligated by the terms of her insurance contract to reimburse her insurer out of any recovery.[166] These terms are commonplace in health insurance contracts.[167] So in the vast

---

[164] *See C.J.*, 151 P.3d at 381-82 (crediting legislative judgment that noneconomic damage awards are "susceptible to over-estimates of the dollar value of a victim's noneconomic loss" but observing "there will be severely injured persons who are under-compensated as a result of this legislation").

[165] The legislature clearly was aware of the role of contractual subrogation in the medical malpractice context. *See* COMMISSION REPORT, *supra* note 23, at 19 (discussing "subrogation problem"). Yet the legislature may have wrongly assumed a subrogated insurer could never recoup its costs from an insured who could not recover those costs directly from the tortfeasor in the first place. *See* 16 COUCH ET AL., *supra* note 10, § 223:145 ("Accordingly, an insurance contract providing generally that the insurer is subrogated to the rights of the insured does not itself permit an insurer to recover from a third-party tortfeasor until the insured has been made whole by the combination of insurance payments and the amount recovered from the tortfeasor, and there must be specific language to the contrary to avoid the make whole rule.").

[166] It is true, as Knolmayer suggests, that McCollum could have refused
(continued...)

majority of cases, allowing claimants to recover damages from the tortfeasor corresponding to the amount of medical expenses paid by their insurers would not create a double recovery. Rather, those amounts would flow straight to the insurer through its

---

[166] (...continued)
medical benefits from the Lowe's Plan and instead sought the entire amount of her medical costs from Knolmayer, thereby avoiding the potential for a double deduction caused by AS 09.55.548(b). But the possibility that a medical malpractice claimant might try to avoid the harmful effects of the statute with such a risky wager has little bearing on whether the distinctions drawn by the statute are substantially related to its purpose.

[167] *See*, *e.g.*, *Best v. Fairbanks N. Star Borough,* 493 P.3d 868, 871 (Alaska 2021) (describing "100% First-Dollar Right of Recovery" provision in health plan for borough employees giving plan "the right to *recover or subrogate* 100% of the benefits paid . . . that the claimant is entitled to receive from any third party . . . on a priority first-dollar basis, . . . regardless of whether the total recovery amount is less than the actual loss suffered." (emphasis added)); *New Orleans Assets, L.L.C. v. Woodward*, 363 F.3d 372, 374 (5th Cir. 2004) ("Insurance contracts typically provide for [an insured's entitlement to both insurance benefits and damage recovery from tortfeasors] in at least two ways: subrogation and reimbursement. With subrogation, an insurer acquires the right to assert the actions and rights of the insured against the liable tortfeasor. . . . With reimbursement, the insurer has only a right of repayment against the insured."); *Perreira v. Rediger*, 778 A.2d 429, 439 (N.J. 2001) (explaining that New Jersey's Commissioner of Insurance, having declined for years to approve "subrogation and reimbursement provisions" in certain health insurance policies, finally allowed their inclusion in 1993); *Principal Mut. Life Ins. Co. v. Baron*, 964 F. Supp. 1221, 1222-25 (N.D. Ill. 1997) (permitting insurer to seek compensation from the insured for medical expenses it paid pursuant to reimbursement clause); *Marshall v. Emps. Health Ins. Co.*, 927 F. Supp. 1068, 1075 (M.D. Tenn. 1996) (permitting insurer to recover under reimbursement clause after finding insurer was precluded from exercising right of subrogation), *aff'd*, 1997 WL 809997 (6th Cir. Dec. 30, 1997); *see also* 16 COUCH ET AL., *supra* note 10, § 226:3 (observing that "insurers have in past decades become increasingly concerned with their ability to recover back their payments directly from their own insureds, by means of 'reimbursement' ").

contractual reimbursement right. There is little reason to think insurers will simply leave easy money on the table.

For that reason, malpractice claimants who receive compensation from non-federal collateral sources are scarcely more likely to receive a double recovery than those covered by Medicaid, which is required by law to seek subrogation, or those whose medical expenses were not paid by any collateral source. It is true that not all claimants who receive collateral source compensation for their injuries will have to pay it back.[168] A small number of claimants may receive compensation for their injuries from collateral sources that are not health plans, such as family members or charity.[169] It is also possible that some health benefit plans do not give the plan a right of reimbursement, although it is hard to imagine why a health plan would forgo that straightforward approach to improving its bottom line. But for the most part malpractice claimants who receive collateral source compensation for their injuries are not poised to make a double recovery when suing a negligent medical provider in tort.

In a world where subrogation and reimbursement provisions are the norm, the statute's differential treatment of medical malpractice claimants based on the existence and type of collateral source compensation is not fairly and substantially related to the

---

[168] The statute modifying the collateral source rule for general tort claims tracks this distinction, which is key to the likelihood of double recovery. *See* AS 09.17.070(a) ("[A] defendant may introduce evidence of amounts received or to be received by the claimant as compensation for the same injury from collateral sources *that do not have a right of subrogation by law or contract*." (emphasis added)).

[169] However, it is worth noting that another major source of collateral source compensation — workers' compensation — also gives the collateral source subrogation and reimbursement rights that minimize the likelihood of double recovery. *See* AS 23.30.015(b), (g), (i) (permitting an employer or employer's insurer to recoup its workers' compensation expenditures directly from the third party or from an employee's tort recovery).

legitimate purpose of preventing double recoveries.[170]  We therefore conclude that AS 09.55.548(b)'s limitation on recovery of collateral source compensation violates Alaska's equal protection clause when applied to a claimant who receives compensation from a collateral source that exercises a right of reimbursement against the claimant's recovery.[171]

## V.    CONCLUSION

We VACATE the superior court's order of April 30, 2020 and REMAND for further proceedings consistent with this opinion.

---

[170]    *Cf. Gilmore v. Alaska Workers' Comp. Bd.*, 882 P.2d 922, 928 (Alaska 1994) (holding formula for calculating injured worker's weekly wage for award of workers' compensation lacked substantial relationship to legislative goal of achieving "quick, efficient, *fair*, and predictable delivery" of benefits and therefore failed minimum equal protection scrutiny (emphasis in original)), *superseded by statute as observed in Schiel v. Union Oil Co. of Cal.*, 219 P.3d 1025, 1031 n.26 (Alaska 2009).

[171]    We express no opinion on how the superior court is to determine whether a claimant falls into this category to which AS 09.55.548(b) cannot constitutionally be applied.  That is for the superior court to decide in the first instance.